# CASES DETERMINED

AT THE

## *August Term, 1892.*

82   613
82   605
82   613
88   324
82   613
91   636
82   613
93   377
82   613
97   149
82   613
103   31
103   32
82   613
106   382
82   613
107   324

WATERMAN, Respondent, vs. THE CHICAGO & ALTON RAIL-
ROAD COMPANY, Appellant.

*April 12 — September 27, 1892.*

(1) *Depositions: Transmission.* (2–5) *Evidence: Cross-examination: Pre-
vious inconsistent statements: Medical books as evidence: Error,
when cured: Rebuttal.* (6, 7) *Instructions to jury: Proximate cause:
Contributory negligence.* (8) *Damages for permanent injury: Prob-
able length of life.* (9) *Improper remarks by counsel.* (10, 11) *Ex-
cessive damages: Remission: Interest.*

1. While depositions were being taken in an action the venue was
changed from Rock to Walworth county. The officer who took
the depositions sent them by his clerk, properly sealed, to the clerk
of the Rock circuit court and the latter opened the package but, on
discovering its contents, closed it again and transmitted it to the
clerk of the Walworth circuit court, to whom the record had pre-
viously been transmitted. There was no claim that the depositions
had been tampered with. *Held,* that there had been a substantial
compliance with sec. 4087, R. S. (which requires a deposition to be
" delivered or transmitted by the officer by whom the same is taken
to the clerk of the court . . . before whom the action . . .
is depending, securely sealed," etc.), and that the depositions were
admissible.

2. In an action for personal injuries a medical witness, who had testified
in behalf of plaintiff on a former trial, was called by defendant and
examined as to the nature and cause of a disease from which plaint-
iff was suffering, and which it was claimed had resulted from his
injuries. *Held,* that on his cross-examination plaintiff might ask
him whether on the former trial he had not, in answer to certain

Waterman vs. The Chicago & Alton R. Co.

questions, expressed an opinion inconsistent with his testimony now given, and, upon his denying it, might show that he had done so, by a stenographer who took down his testimony at such former trial.

3. It is not proper to cross-examine a medical expert in such a way as to get the contents of medical books (not themselves admissible) before the jury, but the error in allowing such a cross-examination is *held*, in this case, to have been cured by the withdrawal of the evidence so elicited and the positive direction of the court to the jury to disregard it.

4. A fireman having testified that a railroad collision was caused by a signal to back up given by a switchman, received by him, and by him communicated to his engineer, and that he had then been a fireman only nine days, it was competent to ask him on cross-examination whether he understood signals well enough to know what the signal was for brakes, and, on his affirmative answer, to ask him if he had not testified differently on a former trial, and also to show that, while he knew the signals at the present time, he was not positive of them then.

5. In view of the medical testimony given on the part of the defendant, it was proper in rebuttal to examine plaintiff's medical witnesses generally on the question whether cold and exposure were the cause of plaintiff's diseased condition.

6. The jury were instructed that they were to say whether the preponderance of the evidence showed that the collision caused by defendant's negligence was the direct and proximate cause of plaintiff's diseased condition, and that if plaintiff's exposure during the preceding night, or any other cause, was as likely under the testimony to have produced such condition as the collision of the trains, then the case must be decided against the plaintiff. *Held*, that such instructions were sufficiently favorable to defendant.

7. Contributory negligence was imputed to plaintiff only on the ground that he rode in an open stock-car to care for his sheep therein, and the evidence tended to show that there was a reasonable necessity for his doing so. The jury were instructed that the burden of proof was upon defendant to show contributory negligence, but that they might consider plaintiff's own testimony, and if such negligence appeared from it, or from it and other evidence, that would be sufficient to establish contributory negligence. *Held*, that such instructions were correct.

8. The testimony tending to show plaintiff's injuries to be permanent, and the jury being authorized to assess damages for future suffer-

ings, it was not error to instruct them that they might judge of the probable length of plaintiff's life under the testimony, which included the life table and proof of plaintiff's physical and mental condition.

9. Remarks by plaintiff's counsel to the jury, to the effect that if the damages assessed by them as just and reasonable should be regarded by the court as excessive, the plaintiff might throw off therefrom as he should see fit, and that money might minister somewhat to plaintiff's comfort "and shall he not have it from a company that is able to pay?" are *held* to be improper. But, the case having been twice tried with the same result in each instance on the question of liability, and the evidence being such as to justify the belief that the rights of defendant on that question were not prejudiced by such remarks, the judgment is not reversed absolutely, but plaintiff is required to remit a portion of the damages awarded.

10. A verdict of $25,000 for a permanent injury is *held*, upon the facts of this case, to be excessive, but in view of a former verdict of $22,500 and of a delay of six years caused by the improper removal of the cause to a federal court at defendant's instance, plaintiff is required to remit but $5,000 therefrom as a condition of having judgment.

11. Upon remitting such amount and taking judgment, plaintiff may tax, as costs, interest on the amount of the verdict as reduced, from the date of its original rendition.

APPEAL from the Circuit Court for *Walworth* County.

This action was brought by the plaintiff to recover for personal injuries alleged to have been sustained by him while a passenger on a stock train of the Chicago, Milwaukee & St. Paul Railway, from Milton in Wisconsin to the stock yards in Chicago, and in consequence of a collision with a freight train of the defendant company, alleged to have been caused by and through its negligence. The plaintiff, on the morning of December 29, 1882, was riding as such passenger in the front car of said stock train, having in charge two car-loads of live stock, part of said train, one of which was loaded with hogs and sheep, and was next to the engine. He rode in this car from about 10 o'clock in the evening until about 8 o'clock on the next morning,

when the accident happened.    It was a cold, windy night. The car was built up on the sides with slats four or five inches wide, and openings of like size between them, and the testimony tended to show that it was necessary that the plaintiff should ride in said car, to look after his sheep and prevent them from getting down and being trampled on; that the stock trains of the Chicago, Milwaukee & St. Paul Railway Company were permitted to avail themselves of the use of the tracks of the Pittsburg, Cincinnati & St. Louis Railway Company, commonly called the "Pan Handle Road," and of the Union Stock Yards Company, to reach the stock yards lying immediately south of Archer avenue; that south of Archer avenue, in the direction of the stock yards, there were two main lines or tracks of said Pan Handle Company, one known as the "eastern" and the other as the "western;" that the said stock train of the Chicago, Milwaukee & St. Paul Company was on the eastern track, going south, and was compelled to and did come to a stop by reason of the fact that an engine of the defendant, with one car loaded with coal thereto attached, was at the same time standing or moving northerly upon the same track, south of said stock train, and near the switch B of said track; that there were cross-over tracks from said eastern track to the said western, and one permanently fixed, about ninety feet long, leaving said eastern track at switch B, connecting with the western track in a northerly direction at switch A, the movable or switch rails belonging to the main tracks, so that defendant's said engine and car could, by means of the connecting track between said switches, cross over and pass northerly to and upon said westerly track of the Pan Handle Company; that the servants of the defendant in charge of its said engine and car loaded with coal proceeded to cross over from the eastern track to and upon said western track accordingly, with the design and purpose of proceeding south with it on the western

track; that, switch B being closed, the eastern track was left open and free to the use of the stock train of the Chicago, Milwaukee & St. Paul Company to the stock yards, and it was signaled to and did start to proceed accordingly; that defendant's train had stopped upon or near switch A, on the western track, but had not proceeded far enough to get so far entirely upon the westerly track of the Pan Handle Company as to admit of the closing of the switch A, so that said engine and car could proceed south; that owing to a false or mistaken signal, for which it is claimed the defendant company was responsible or in fault, its engineer reversed his engine to go south, at the same time the St. Paul train started south on the eastern track; that, owing to said switch A not being properly placed, the defendant's servants in charge of its engine and car suddenly, recklessly, and negligently started and ran the same in a southerly direction back again on said cross-over track, and they were driven and propelled with great force and violence against the car in which the plaintiff was riding, at or near switch B on the eastern track, whereby it was forced up from the track, and over in an easterly direction, and that by reason of the collision the plaintiff received serious injuries, which, it is charged, did and would continue to permanently incapacitate him and render him wholly unable to perform any labor or to attend to any business thereafter; that the injuries so received by the plaintiff caused serious inflammation and disease of the plaintiff's spinal cord; that he had become partially paralyzed, and he alleged that said paralysis and disabled condition of his spinal cord were progressive and increasive, and that in consequence thereof he would, during his entire life, continue to suffer great bodily and mental pain and anxiety, and great pecuniary loss and damage, by reason of such incapacity to work and attend to business, etc.

The defendant answered, putting in issue the allegations

of the complaint as to the negligence charged, and denying that the plaintiff had received any injury as claimed by him in his complaint.

The action was originally commenced in the circuit court for Rock county, and proceedings for its removal to the circuit court of the United States for the western district of Wisconsin were taken in October, 1884, and after the case was docketed in that court it was tried there in 1885, resulting in a verdict for the plaintiff for $22,500. The defendant took a writ of error to the supreme court of the United States, where the judgment rendered on such verdict was reversed in 1890, on account of the insufficiency of the petition for removal to confer jurisdiction on the United States court, and the supreme court of the United States directed the circuit court of the United States to remand the case to the state court from whence it came.

A considerable amount of testimony was given upon the question whether the collision was caused by the negligence of the defendant company, its servants and employees in charge of its train. The contention of the plaintiff in regard to the manner in which the plaintiff received his injury, and the nature and character of it, may be best stated by quoting from the hypothetical question propounded to the plaintiff's medical and surgical witnesses: "That while riding in the stock car, near Archer avenue, in the city of Chicago, and while sitting on a partition crossing the car at about its center, he saw through the sides of his car, which was a slatted car, stock car, a train belonging to the defendant backing towards the car in which he was riding, upon a connecting track; that he sprang with all his might from the place where he was sitting for a window in the rear end of his car, and with his left hand got hold of one of the iron rods at the window; that about the same time that he caught hold of the iron rod, some portion of the defendant's train collided with the west side of his car,

and he felt the shock, and the sheep came against him, and
carried his feet from under him; that he felt that he lost
consciousness for a moment, and when his full consciousness
returned he found himself still clinging to the iron rod with
his left hand, but with his feet carried from under him, and
elevated to near the top of the car at its east side; and, in
carrying his feet from under him, the sheep wrenched and
twisted his body; that he was lying on his left side and
back, on the heads of the sheep, and they were crowding
against him; that the car was tipped to the east from a
horizontal position; that the head of one stag sheep, with
horns, was pressing against the plaintiff's back and left
side,—the small of the back; that plaintiff worked himself
in such position so as to get his feet upon the floor of the
car, and tried to open the window by pushing the same to
the left with his right hand; in doing so he felt a sharp
pain on the left side of the small of his back, and stopped
his efforts to open the window; that he tried it again in
the same way a moment later, and, the same pain recurring
again, he stopped; that he then opened the window, and
got through it to the ground on the east side of the train;
that he tried with his brad stick to poke the sheep back as
they piled up on each other, and felt a recurrence of this
pain in the left side of his back; that he walked around the
train to the left hand side of it, and in walking felt no pain
ordinarily, except that a jar in walking would cause a re-
currence of the pain; that after about an hour he got upon
the engine of his train, and it proceeded to the stock yards,
a distance of about two miles; that in crossing frogs in the
track the jar would cause a recurrence of the pain before
mentioned, and some sickness at the stomach; that after
arriving at the stock yards he took figures of sales of some of
his stock, and attempted to make reckonings or computa-
tions, when his mind became confused, and he would be un-
able to do so; that upon sitting down for a moment he would

feel a peculiar, dreamy sort of drowsiness; that he walked from the stock yards to a street car, a distance of about forty or eighty rods, and after leaving the street car walked a short distance to the depot of the St. Paul Company, where he took a train for his home; that upon the trip home, when standing on his feet, he experienced a recurrence of the feeling of sickness at his stomach, and a recurrence of the pain upon jarring or jolt of the car; that he located this pain from an inch to two inches to the left of his backbone, in the small of his back, about opposite the first long rib; that upon his arrival home hot applications were made to his back; that during the night he woke up with pain two or three times; that in the morning his medical attendant, Dr. Borden, made other hot applications, but found no external appearance of injury, except sensitiveness to touch or pressure at the place of pain mentioned; that his temperature was below the normal condition, and he was in a state of depression; that about two or three days after there was an impairment of motion in the lower extremities, being more marked in the left leg than in the right; that after the first week he was unable to turn over in bed without assistance; that in order to turn over his feet would have to be lifted, and when raised to a sitting posture at the side of his bed, with his feet off the bed, he could not get his feet on the bed without having them lifted; that he continued to experience pain in his back, a dull, heavy pain, continuously or almost continuously, and at intervals sharp pain, and also felt severe pain at one time in the early period of his history in the cord of the left testicle, and felt pains in the calves of his legs, more particularly in the left leg; that there was also impairment of sensation in the legs, more marked in the left; that his condition grew gradually worse, and he was confined to his bed most of the time; that these symptons were prevalent until about the middle of February, 1883,

or a little after, when he experienced what he says was a peculiar sensation coming over him; that he thought he was going to die; was carried to bed; that he experienced some feeling of constriction or girdle sensation across his bowels, and, just after this feeling or sensation, experienced a feeling of pain at the base of the brain; soon after this his speech was affected, and his sensibility to sound became acute, so that reading to him disturbed him, causing a stunning sensation; that jarring by walking across the floor or touching his bed disturbed him; that his arms, hands, and more particularly fingers, became tremulous, but this tremulous condition passed away or greatly improved; that he had not usually been able to have a movement of the bowels without the aid of physic or injection; that he felt as if there was a knuckle in his backbone, near where he first felt the pain, and the point where this pain, as first felt, was most severe was about one or two inches to the left of the middle of the back or from the backbone; that he required a change of position in turning over, from three to five times during the night, in the early stage; that since his injury he lies best upon his right side; that since the occasion when he thought he was going to die his sight has been affected so that he has been able to read but little; that his will power has been affected at times, so that he was easily moved to tears; that his condition at present is somewhat improved, so that he is able to get off his bed and get back upon it without assistance; his ability to speak is improved, so that he speaks better than formerly, and he does not suffer so much pain; can move his legs better; but there is tenderness in the same locality on his back, and his irritability in the extremities is less marked than formerly."

The hypothetical question propounded by the defendant to its medical and surgical witnesses was somewhat more

elaborated, and differed in some particulars from the above, but not materially affecting the legal questions involved. Considerable testimony was directed to the subject whether the injury of which the plaintiff complains was the natural and proximate result of the accident or collision, or whether it was the result of exposure and cold, and not the result of direct injury. The plaintiff testified that there was no discoloration of his back that he knew of, nor any contusion or breaking of the skin, and he could not say certainly whether there was any bruised condition at the point where he had the pain, or on any other parts of his body, or any swelling on his back or side; that, so far as he knew, there was nothing in outward appearance at the time to indicate any injury of any kind. The medical and surgical experts on behalf of the plaintiff, in answer to the hypothetical question, attributed his injury to his experience in the car at the time of the collision, saying that the hypothetical question assumed that there was an injury to begin with, and they traced his condition to that; that if there was no injury, then otherwise; that the train of symptoms might be accounted for on other grounds; that they might be accounted for on the basis of a disease, rather than from any injury or external force. Other medical and surgical experts, called on behalf of the defendant, in answer to defendant's question, expressed the opinion that his injuries were due to the exposure to cold, and the ride during the night in the stock car; and testified that diseases of the spine and spinal cord resulting from severe exposure and cold and fatigue are very common — the commonest forms of spinal disease.

The jury gave a verdict for the plaintiff, and assessed his damages at $25,000. A motion for a new trial, on the grounds, among others, that the verdict is contrary to the evidence and that the damages are excessive, was denied,

and from the judgment entered on the verdict the defendant appealed. Other material statements are contained in the opinion.

For the appellant there were briefs by *Fethers, Jeffris & Fifield,* and oral argument by *O. H. Fethers* and *M. G. Jeffris.* They contended, *inter alia,* that the depositions of the witnesses Murphy and Mann were improperly admitted. Those depositions were not delivered or transmitted by the officer before whom the same were taken to the clerk of the court before which the action was pending. R. S. sec. 4087. All the statutory requirements for the taking and returning of depositions must be complied with. *Baxter v. Payne,* 1 Pin. 501; *Goodhue v. Grant,* id. 556; *Cross v. Barnett,* 61 Wis. 650; *Beale v. Thompson,* 8 Cranch, 70; *Shankwiker v. Reading,* 4 McLean, 420; *Plummer v. Roads,* 4 Iowa, 587. The evidence by means of which plaintiff's counsel got the contents of the medical books before the jury was so clearly incompetent and so morally certain to have influenced the jury that the error in admitting it was not cured by striking it out. *Bullard v. B. & M. Railroad,* 64 N. H. 27; *McDuff v. Detroit E. J. Co.* 84 Mich. 1; *Johannesson v. Borschenius,* 35 Wis. 131.

*William Ruger,* attorney, and *I. C. Sloan,* of counsel, for the respondent.

The following opinion was filed May 3, 1892:

PINNEY, J. 1. The assignment of error, that the verdict is contrary to the evidence, cannot be maintained. Upon the questions of fact involved in the issue the testimony is so clear on some of the points in favor of the plaintiff, and so conflicting on others, that this court cannot interfere with the verdict. There is sufficient evidence to sustain it.

2. It is not material to inquire whether there is sufficient evidence to sustain the verdict, independent of the depositions of Martin Murphy and Thomas Mann, had they been

rejected, for we are of the opinion that these depositions were properly admitted. When the notice was given to take them, April 25, 1890, the action was pending in the circuit court for Rock county, and the notice was entitled in the cause as pending in that court. The taking of the depositions was in fact commenced on that day, but they were not concluded until the 29th of the same month. In the mean time, and on the 28th, an order had been made changing the place of trial of the action to the circuit court for Walworth county, and the record and papers in the action were accordingly certified and transmitted to the clerk of the last-named court, and filed in his office, May 1st. On the 6th of May the depositions, having been properly certified by the notary before whom they were taken, were sealed up and delivered by his clerk to the clerk of the circuit court for Rock county, who opened the package, and it so remained until he forwarded the depositions, on the 7th of May, to the clerk of the circuit court for Walworth county, who received and filed them May 9th. The objection is that the depositions were not delivered or transmitted by the officer before whom they were taken to the clerk of the court before which the action was pending; that, instead of leaving the officer who took them to return them to the clerk of the court in which the cause was entitled in the notice for taking them, as he naturally would, the plaintiff's attorney should have notified him of the change of place of trial and the transmission of the record, and procured him to send them to the clerk of the circuit court for Walworth county. The clerk of the circuit court for Rock county, upon discovering the contents of the package, closed it up, and transmitted it to the clerk of the same court, to whom he had already transmitted the record and papers.

All the statutory requirements for taking and returning depositions must be substantially complied with. The stat-

ute (sec. 4087, R. S.) requires a deposition, when taken, to be "delivered or *transmitted by* the officer by whom the same is taken to the clerk of the court : . . . before whom the action . . . is depending, securely sealed." It surely cannot be maintained that the officer taking these depositions might not send them over by his clerk to the office of the clerk of the circuit court in the same city. This would be strictly a *transmission* of them to that clerk, and there is no reason for saying that when they had been so transmitted, duly sealed, he could not lawfully forward them by safe means to the clerk of the court in which the action was then actually pending, so that they could be filed and used on the trial. There is no pretense of any improper practice, or that the depositions had been tampered with. We think that, under these circumstances, they were properly transmitted to the clerk of the circuit court for Walworth county. Substantially the same objection was made to the use of depositions under similar circumstances, and it was held untenable, in *Gee v. Bolton,* 17 Wis. 605, 608, 615.

3. One of the defendant's expert witnesses, Dr. Palmer, who had been called to visit the plaintiff in consultation three several times with his medical attendant, Dr. Borden, and who testified as a witness in his behalf on the trial in the United States court, and was examined to some extent by the defendant on that trial, now testified, in answer to the hypothetical question put by the defendant's counsel, that in the plaintiff's case there first existed lumbago or congestion of the lumbar and spinal muscles; that inflammation of the spinal cord and its membranes followed, and subsequent to this an extension of that inflammatory action to portions of the brain and its membranes; that, as an opinion founded on the state of facts as presented in the hypothetical question, he should say that the plaintiff's condition was the result of exposure and cold, and not the re-

sult of direct injury; that, upon such facts and the history of the case as given him by the plaintiff and Dr. Borden, his medical attendant, and his personal examinations of the plaintiff, he did not vary his judgment. The collision occurred December 29, 1882, and Dr. Palmer visited the plaintiff with Dr. Borden, making a personal examination, February 9, 1883. Again he visited him, April 12th and. also December 19th in the same year, and the next time he saw him was in December, 1885, a few weeks before the trial in the United States court, when he examined the plaintiff again, with several other physicians and surgeons. On cross-examination he testified, in answer to questions regularly objected to by the defendant: "I don't think I have changed my opinion as to the character of his disease;" that "*locomotor ataxia* is a different disease from lumbago;" that he had " no knowledge of testifying at Madison that the plaintiff had *locomotor ataxia;*" and if he so testified, it was not in accordance with his views of the case at that time, nor ever has been. "I think I did not so testify. I don't think that he has *locomotor ataxia* now. I think I was asked what, in my judgment, was the matter with the plaintiff, and that I answered, 'I think he has a diseased condition of the spinal cord and meninges (its membranes), one or both.' I don't think I said, 'I think his disease or condition at the present time would be accounted for more perfectly by the name of " *locomotor ataxia* " than any other name.' I do not think that he had that disease, and therefore think I could not have made this answer. I wish to qualify myself in this: that is, he had conditions there present similar to what you get in *locomotor ataxia*. Those diseased conditions mingle with each other. You cannot well define and separate one from another. I never testified to his having *locomotor ataxia*." In like manner he was asked whether he had, upon that trial, made certain answers to specific questions in regard to *locomotor ataxia;* as to its

causes; whether it proceeded more usually from injury or
from disease; and whether emotional disturbances, such as
sudden fright, might cause it, a fall, the shock of a gunshot
wound, and concussion of the spinal cord; as to the various
symptoms and stages of the disease, and the period of their
development.

These questions were objected to as not proper cross-
examination in order to contradict the witness, and as im-
material; that the inquiries related to collateral matters,
and not to any matter in issue, but the court ruled that
they should be answered; and the witness, in every in-
stance, denied that the alleged questions and answers had
been given, or denied any remembrance of the fact. On
rebuttal, the plaintiff called a stenographer, present at the
trial in the United States court, who testified from his
minutes — against objection to each question by defend-
ant's counsel, that the inquiry was immaterial and irrele-
vant, and that no proper foundation for it had been laid —
that Dr. Palmer, on that trial, testified that he thought the
plaintiff had a diseased condition of the spinal cord and
meninges, one or both; that it is known by a particular
scientific name; that he thought his disease or condition
at that time would be accounted for more perfectly by the
name of "*locomotor ataxia*" than any other name; that
*locomotor ataxia*, of whatever type, did not as usually
proceed from injury as from other causes; that he was
asked, "Doesn't it proceed from injury just as much as
from other causes?" and he answered, "No, sir; not so
much as from other causes. I think it is a very unusual
thing." That the witness testified that an emotional dis-
turbance, such as sudden fright, might be a cause of *loco-
motor ataxia;* that various traumatic injuries (by external
force) might be the starting point of *locomotor ataxia;* and
that instances are recorded in which the disease soon fol-
lowed a fracture of the thigh, a fall upon the belly, the

shock of a gunshot wound, and concussion of the spinal cord, but that very few authors are inclined to that opinion, and he did not know of any author that applied it to a direct injury. Dr. Palmer, on being recalled, testified that at that trial he was placed on the witness stand out of his order, to enable him to go to Chicago to attend to his duties there as a lecturer at the college, and returned to be further examined by the plaintiff, as he understood he had not completed his testimony, and plaintiff's counsel told him he desired to examine him further; that he did not suppose that he was called there by the defendant at any time; that his recollection had been refreshed since his cross-examination in relation to the testimony he gave on that trial; that he now recollected that he gave evidence upon the question of *locomotor ataxia;* that he did not recollect it when cross-examined. " I don't know that I gave, at any time during that trial, any testimony in relation to *locomotor ataxia,* as applied strictly or directly to *Mr. Waterman's* case, except in the one particular question and answer above mentioned. I do not recollect of it anyhow."

The general rule is that, with respect to all questions put to a witness on cross-examination for the purpose of directly testing his credit, if the questions relate to relevant facts, the answers may be contradicted by independent evidence; if irrelevant, they cannot. Taylor, Ev. §§ 1435, 1438; 1 Greenl. Ev. § 464; 1 Whart. Ev. § 551. It is not necessary that the prior statement of the witness, in order to affect his credit, shall be expressly and strictly contradictory to the testimony as given. It is enough that he has made statements inconsistent with his testimony on the trial. Whart. Ev. § 551, and cases cited. In Taylor, Ev. § 1445, it is laid down that "it is certainly relevant to put to a witness any question which, if answered in the affirmative, would *qualify* or contradict some previous part of his

testimony given on the trial of the issue; and if such ques-
tion be put and be answered in the negative, the opposite
party may then contradict the witness; and for this simple
reason: that the contradiction would *qualify or* contra-
dict the previous part of the witness' testimony, and so
neutralize its effect (*Attorney General v. Hitchcock,* 1 Exch.
102); and he may be cross-examined as to a former state-
ment made by him *relative to the subject matter* of the cause,
and inconsistent with his present testimony. If the case
be such as to render evidence of *opinion* admissible and
material, he may be asked on cross-examination whether
he has not on some particular occasion expressed a differ-
ent opinion on the same subject, and if he denies the fact it
may be proved by other evidence." Taylor, Ev. § 1445; Law-
son, Exp. Ev. 177. This was so held in *Sanderson v. Nashua,*
44 N. H. 492–494; *Patchin v. Astor Mut. Ins. Co.* 13 N. Y.
272; *Miller v. Mut. Ben. L. Ins. Co.* 31 Iowa, 236.

Dr. Palmer, on the pending trial, had given his opinion
as to the ailment of the plaintiff; that there first existed
lumbago or congestion of the lumbar and spinal muscles,
subsequently followed by inflammation of the spinal cord
and its membranes, and subsequent to this an extension of
that inflammatory action to portions of the brain and its
meninges; that it was the result of exposure and cold and
not of direct injury; and this was based, not only upon
the facts stated in the hypothetical question, but upon the
history of the case as given him by the plaintiff and by Dr.
Borden when he was called in consultation, and from his
personal examination of the plaintiff,— all of which oc-
curred before the trial in the United States court. It was
competent for the plaintiff, on his cross-examination, to lay
the foundation for showing that in his testimony on the
former trial he gave an entirely different and inconsistent
opinion as to the plaintiff's condition and its cause, and one
inconsistent with the theory that it was the result of ex-

posure and cold and not the result of direct injury. This testimony was competent, as a test of the sincerity, candor, and value of Dr. Palmer's opinion given in evidence on the present trial, to show that the plaintiff's disease was attributable to exposure and cold, and not to direct injury as claimed by the plaintiff, and to test its reliability and the proper weight to be given to his opinion in determining this issue. On the former trial, he had testified as the plaintiff's expert witness, familiar, not only with the learning of his profession on the subject, but as having had a practical acquaintance with the case from his employment in it in consultation with Dr. Borden, the plaintiff's medical attendant, and he was examined to some extent on behalf of the defendant. On the last trial he appeared and testified only as the medical and surgical expert of the defendant. All the facts and circumstances elicited on his cross-examination and on the examination of the stenographer were competent to show contradictions or inconsistencies between his opinions upon the point in question expressed by him at the first trial and those given on the last one. The testimony of the stenographer could not be injurious to the defendant, unless such contradictions or inconsistency appeared. Dr. Palmer's opinions upon the plaintiff's condition and its cause had become a material and essential part of the defendant's case, and whatever might be drawn out by the examination objected to, as affecting their value and weight, was in no just sense collateral, but pertained and related directly to the case itself.

4. Upon the cross-examination of Dr. Maxon, one of the medical and surgical witnesses for the defendant, he testified in relation to cases of inflammation of the spinal cord which had occurred in his practice, and the plaintiff framed and put various questions embracing cases stated in Erickson's work on Nervous and Spinal Diseases, and he was asked his opinion in respect to them. One of these ques-

tions was objected to as incompetent and immaterial, and he was allowed to answer it, but a subsequent question was objected to for the further reason that the reading of cases from medical books to a witness, expert or otherwise, was improper, and then the plaintiff's counsel desisted. Another medical witness for the defendant, on cross-examination, was asked what cases he had treated of inflammation of the spine, and in stating one case in detail he was proceeding to and did state others, and was allowed to do so against the defendant's objection. After the close of the testimony the plaintiff's counsel applied to the court to withdraw the testimony of these witnesses so objected to from the consideration of the jury, and to instruct them to disregard it, and the court granted the request, and instructed the jury accordingly.

It is settled in this state and in most of the others, that medical books cannot be introduced in evidence, nor can an expert be permitted to testify as to statements contained in them (*Boyle v. State*, 57 Wis. 472; *Kreuziger v. C. & N. W. R. Co.* 73 Wis. 158); but they may be referred to on the cross-examination of a medical expert, where he has testified that books, recognized as standard authorities in the profession, lay down certain propositions or sustain certain conclusions, for the purpose of discrediting him (*Ripon v. Bittel*, 30 Wis. 614; *Comm. v. Sturtivant*, 117 Mass. 122; *Pinney v. Cahill*, 48 Mich. 584). When the books themselves are not admissible, an attempt to evade the rule of exclusion by conducting the cross-examination in such a way as to get the contents or statements in the books before the jury, is not admissible. Rog. Exp. Ev. § 178; *Marshall v. Brown*, 50 Mich. 148; *People v. Millard*, 53 Mich. 63, 77; *Bloomington v. Shrock*, 110 Ill. 219; *State v. Winter*, 72 Iowa, 627. We think the course pursued on the cross-examination of Dr. Maxon was erroneous, but that the error in relation to it, and the admission of other testimony so objected to, was

cured by the subsequent withdrawal of it and the positive direction of the court to the jury to disregard it. Thomp. Trials, §§ 351, 2355; *Johannesson v. Borschenius*, 35 Wis. 132; *Delie v. C. & N. W. R. Co.* 51 Wis. 405, 406; *Giese v. Schultz*, 69 Wis. 521–524; *Beggs v. C., W. & M. R. Co.* 75 Wis. 448; *Hawes v. Gustin*, 2 Allen, 402; *Goodnow v. Hill*, 125 Mass. 589; *Hopt v. Utah*, 120 U. S. 437. In view of all the evidence properly admitted,— and it is certified that it is all contained in the bill of exceptions,— we cannot say that the defendant was prejudiced by the course pursued.

5. The questions asked the defendant's witness Martin Williams, on cross-examination, were within the limits of the rule. He was a fireman on defendant's train at the time of the collision, and had been looking out on his side of the cab for signals, and he testified that he received a signal from a man near the switch target to come back, and he described it. He communicated it to the engineer, who started his train back with the view of going south on the westerly track, and, instead, ran back over the cross-over track, colliding with the St. Paul train on which the plaintiff was riding, because the switch had not been turned to enable the train to go south, the signal given having been a false or improper one. He testified that he had had no experience as a fireman, except for nine days, and as to the meaning of the signal he received. It was competent to ask him, on cross-examination, whether he understood signals well enough to know what the signal was for brakes, and, on his affirmative answer, to ask him if he had not testified differently on a former trial, and also show that, while he knew the signals at the present time, he was not positive of them then.

6. There was no error in permitting Dr. Philip Fox, Dr. B. O. Reynolds, and Dr. William Fox to testify in rebuttal as to the reasons why they did not think the plaintiff's condition was caused by exposure and cold. When exam-

ined by the plaintiff in making out his case, neither Dr. Philip Fox nor Dr. Reynolds testified on that subject, while Dr. William Fox had testified that, considering injury by cold as an exciting cause of plaintiff's condition, he would not consider it to be likely that there would be local inflammation, so that a particular point, the size of a finger, would be a focal point of sharp pain. In view of the medical testimony given on the part of the defendant, it was proper, in rebuttal, to examine him generally on the subject whether cold and exposure were, in his opinion, the causes of the plaintiff's condition, and Dr. Philip Fox and Dr. B. O. Reynolds as well.

7. The court was asked to instruct the jury, in substance, that if they found from the evidence any cause or causes sufficient to stand as the cause of the plaintiff's misfortune, other than the collision, then they should find for the defendant; and also that the damages of the plaintiff, if entitled to recover any, must be the natural and proximate consequence of the acts of the defendant complained of; and that if a new force or power intervened, or the exposure to which the plaintiff voluntarily subjected himself by riding during the previous night in an open car, were, either or all of them, sufficient to stand as the cause of the plaintiff's physical condition, *then* the collision of the trains must be considered as too *remote*, and they should find for the defendant. These instructions wholly ignore the *real* cause of the injury, and under them the jury would be obliged to find for the defendant, even though the evidence should convince them that the *actual cause* of the plaintiff's condition was the collision due to the defendant's negligence. It is plain that what was the *real cause* was a question, under the evidence, for the jury, and a finding for the defendant would not be necessarily proper, even though the supervening force or power referred to was sufficient, perhaps, to produce the result complained of. The court left the

case to the jury on this point, very properly, to say whether the preponderance of the evidence showed that the collision of the trains caused by the negligence of the defendant company was the direct and proximate cause of the plaintiff's diseased condition; that if the plaintiff's exposure during the preceding night, or any other cause or power which intervened, or either or all of them, was *as likely*, under the testimony, to have produced the plaintiff's diseased condition as the collision of the trains, then the case must be decided against the plaintiff. These instructions were correct, and as favorable to the defendant as it was entitled to ask.

8. The instruction of the court on the subject of contributory negligence was not objectionable, in view of the evidence. Contributory negligence was not imputed to the plaintiff, save in respect to his riding in the open car with his sheep to care for them, and the evidence tends to show that there was a fair and reasonable necessity for the plaintiff to ride in the stock car. That he did so ride in it is not, as a matter of law, contributory negligence; nor does the case of *Lawson v. C., St. P., M. & O. R. Co.* 64 Wis. 447, maintain that it would be. The instructions of the court on this subject are not open to any just criticism. The jury were told that the burden of proof was on the defendant to show contributory negligence of the plaintiff by a preponderance of evidence, yet they were also told, in the same connection, that the plaintiff's own evidence might be considered in determining this question; and if contributory negligence appeared from it, or from it and other evidence, it would be sufficient to establish contributory negligence. The defendant has no ground of complaint in this respect.

9. The testimony tends strongly to show that the plaintiff will never entirely recover from his present condition, and as the jury was authorized to assess damages as a com-

pensation, not only for what he had suffered in the past, but for what he would with reasonable certainty suffer in the future, it was not error to instruct the jury that they might judge of the probable length of the plaintiff's life under the testimony, inasmuch as his physical and mental condition had been proved, and the life table adopted in the circuit court rules had been read to the jury.

10. The motion to set aside the verdict was based on the ground, among others, that the damages are excessive, as well as on account of the statements made by plaintiff's counsel in addressing the court and jury, and excepted to by the defendant. The testimony shows that the plaintiff was engaged in the stock business, and at the time of the accident was superintending his father's and uncle's farms; that since the accident he had not been able to attend to looking after the farms or stock business; that if he had any business to do he had to get some one to do it for him; that some years the stock business would be good, and other years it would not be so good, and the farm business would vary but very little; that the plaintiff thought he would realize about $1,500 a year, together with the farm and stock business; that he did not own a farm at the time himself; that he had a farm rented and sublet it on shares; that the first year after the accident his wife had to be up with him from five to seven times each night, the second year from three to five times; for over five years every time he was raised off his bed he had to have his limbs lifted off, and then to be raised up, and then when he wanted to lie down his limbs would have to be raised up; that the failure of strength to support himself and let himself down gradually was in his back; that for about five years he never laid on his back, except three or four times; that " after five years I had to be helped to my chair. Then I was unable to move my feet. If I wanted to use my crutches, they would get me up on to them, and then, one of them holding on

to me, I could manage to walk a little along, but after sitting down I could not move my feet, unless they were taken and moved along." That since February, 1890, his condition had improved. "I have to get up now with the aid of my arms. I have to make my arms my back. During the last three years I have not had such hard, sharp pains as during the first five. The dull pain is continuous. The last year and a half I have been sleeping quite a little better, but previous to that I didn't sleep well. Would wake up three to five times each night,— sometimes more. When I wake up now I have to have assistance to be turned over. I cannot use my left leg as well as my right. My speech has been affected since February, 1883. I have gradually improved ever since the trial at Madison, but have not felt so well since last June, having had the grip in the spring. Was forty-one years at the time of the accident."

The remarks made by plaintiff's counsel in argument were not called for or justified by anything in the case, and were violative of the defendant's right to a fair trial, to be conducted according to well-recognized rules and usages. The violation of these rules and usages is an impropriety which may greatly affect the verdict, and, if counsel indulge in such methods of argument, it is the duty of the court to see that their client shall not derive any advantage from them, and that the rights of the party who may be thus prejudiced are fully protected. The remarks complained of in this instance relate more especially to the subject of damages, and no doubt stimulated a sympathetic and willing jury to materially increase the amount of the verdict. The tendency of juries at the present time to give large, and indeed unusual, verdicts in actions for personal injuries brought against corporations is almost proverbial, and is well understood by all having experience in the courts,— verdicts which would not be given as against a natural person. No stimulus or encouragement

in this connection is needed, and no unfair or improper influence to produce such a result can be permitted. A corporation must be judged by the same law as a natural person. The law is no respecter of persons, natural or artificial, and in its administration the rights of each are equally sacred. The jury were told by one of plaintiff's counsel that "if it should so be that the sum you fix as just and reasonable should be regarded by the court as excessive, it is our privilege to throw off as we see fit to;" in other words, that the jury could make no mistake by rendering a large verdict, and the plaintiff would take his chances in holding it. The court ruled that this was improper. And the able and experienced senior counsel, in addressing the jury on the question of damages, said: "Money may minister somewhat to his comfort, and *shall he not have it from a company that is able to pay?*" And this passed without notice, save by the defendant's exception. Such methods of argument cannot be justified, and ought not to be tolerated. *Brown v. Swineford*, 44 Wis. 290–295, and cases cited, is an emphatic rebuke and warning on this subject.

Were it not that the case has been twice tried, in both instances with the same result on the question of liability, and that the evidence is such as to justify the belief that the rights of the defendant on that question were not prejudiced by these irregularities, we would feel bound to reverse the judgment absolutely on this ground, and grant a new trial. We entertain no doubt that this improper appeal tended materially to increase the verdict. The verdict is an unusually large one, and one, we think, which would not have been given against a natural person, and the award of damages, all things considered, must be regarded as excessive. We are aware of the intrinsic difficulty of dealing with such a question upon any certain or satisfactory rule. It is entirely a pecuniary question as to what amount of compensation is to be allowed to stand as

damages in a practical and reasonable administration of the law. The fact that there is no definite rule for arriving at the amount of damages in such cases shows the importance of guarding the minds of the jury from all misleading and improper influences and appeals. *Dillingham v. Scales*, 78 Tex. 205. There is but little doubt that the tendency of juries to render excessive verdicts against corporations supposed to be rich, leads to abuse and ought to be restrained. No intelligent person would deliberately consent to encounter the loss of physical and mental health and the capacity of the rational use and enjoyment of his faculties during life, and the inconvenience, pain, and anguish which the plaintiff has already suffered and will experience in the future, for the value of the entire property and franchises of the defendant. But it is manifest that the rule of damages is not to be governed by such considerations, nor can they be entirely disregarded. We do not think the facts justify as large a verdict in this case as was allowed to stand in the case of *Heddles v. C. & N. W. R. Co.* 77 Wis. 228, and, had a recovery been had in the circuit court within an ordinary period after the action had been commenced, we are inclined to think we would be reluctant to let it stand for more than $15,000; but in October, 1884, the case, at the instance of the defendant, was, as it turned out, improperly removed into the United States circuit court, where, after a lengthy and probably expensive trial, resulting in a verdict in favor of the plaintiff for $22,500, the case was taken to the supreme court of the United States, and it was there decided, after a lapse of six years, that the United States court had no jurisdiction over the case. During all this time satisfaction for the plaintiff's injuries was withheld, through the fault and at the instance of the defendant, by keeping the case so long in a court having no power to give any relief. We feel, therefore, at liberty to act upon equitable considerations some-

what in determining at what sum the verdict, which we hold to be excessive, shall stand at the election of the plaintiff, and in view of all the circumstances we conclude that the judgment of the circuit court be reversed, and that the cause will be remanded with directions that if, within thirty days after filing the *remittitur* in that court, the plaintiff shall remit $5,000 of the amount awarded by the verdict, judgment shall be entered thereon in his favor for $20,000, with costs. Failing so to remit, there must be a new trial.

*By the Court.*—Judgment is ordered accordingly.

WINSLOW, J., took no part.

Both parties moved for a rehearing, and both motions were denied September 27, 1892. The following opinion was filed:

PER CURIAM. The question whether interest shall be allowed in the entry of judgment, if the plaintiff elects to remit $5,000 from the verdict, has been presented on appellant's motion for rehearing, and, in order to prevent any misapprehension, we think it proper to say that, in that event, judgment will be entered as on a verdict for $20,000, and the plaintiff will be entitled to tax, as costs, interest on that sum from the date of the original verdict, pursuant to the statute. Sec. 2922, R. S.