DUNHAM and others, Appellants, vs. SALMON and others,. Respondents.

*November 10—December 4, 1906.*

*Sales: Warranties: Fraud: Rescission: Principal and agent: Authority to make warranties: Evidence: Witnesses: Cross-examination: Impeachment: Materiality: Appeal and error: New trial on. reversal.*

1. In an action for the price of a stallion transferred by a formal bill of sale containing a special warranty and a stipulation that, on failure of the warranty, plaintiffs would furnish another stallion of *equal quality* in exchange upon the return of the stallion in question, there was interposed an answer alleging breach of warranty and of fraud in the sale, but there was neither pleading nor proof that the stallion had ever been returned or that defendants had ever offered to return it. *Held,* that the trial court rightly ruled that the question of fraud was not in the case.

2. In such case no breach of the written warranty was shown, since it only bound the plaintiffs to furnish another stallion upon condition of the return of the one sold.

3. In an action on a joint and several note given by numerous defendants for the purchase price of a stallion, there was pleaded a breach of warranty. There was evidence of a special written warranty which had not been breached because of failure of defendants to comply with its conditions, and there was also an attempt to prove an oral warranty by the plaintiffs' agent. The jury found the making of such oral warranty and its breach. *Held,* that the jury's findings were not justified in the absence of proof that the oral warranty was made to each one of the defendants.

Dunham v. Salmon, 130 Wis. 164.

4. In such case, even though the evidence tended to show that the agent made such oral warranty to each and all of the defendants, the defendants could not succeed without showing that the agent had express authority from his principal to make such warranty, or that such sales were usually attended with such a warranty.

5. Where several subscribers in buying a stallion understood that the talks each had with the agent of the sellers were merely tentative, that the transaction was only to be consummated after a required number of subscribers had been obtained, and then only with a voluntary association of all subscribers then to be formed, a written warranty given at that meeting supersedes any oral promise of warranty made to individual subscribers.

6. In an action on a note for the price of a stallion, one of the plaintiffs testified that they owned the note, stated the amount due thereon, and that a bill of sale with warranties was given with the animal. Upon cross-examination he denied that he had offered P. a share in the horse for nothing if he would allow the use of his name to influence others. After plaintiff had so answered, a general objection was made and overruled. P. having been put on the stand by defendants was asked what offer had been made him, which question was objected to as incompetent, irrelevant, and immaterial, whereupon counsel stated it was offered to impeach plaintiff, and on this ground the objection was overruled. There was no issue of fraud in the case. *Held:*

(1) The question was irrelevant on plaintiff's cross-examination, since plaintiff had given no testimony which the alleged statement tended to contradict.

(2) The objection not being interposed until after the question was answered, and there being no motion to strike out the answer, plaintiffs, on appeal, could not take advantage of the fact that the question was answered.

(3) On P.'s direct examination the objection should have been sustained. The question asked of plaintiff did not relate to a relevant fact, and hence his answer could not be contradicted even for the purpose of impeachment.

7. In an action for the price of a stallion, where no warranty is claimed as to the quality of the colts gotten by the horse, testimony that the colts gotten by him were defective is immaterial.

8. Although proper motions have been made to strike out and change the answers to a special verdict, where there are legal principles involved which were not appreciated by the parties or the trial court, and it is not improbable that on another trial there may be testimony on lines not covered on the first trial, a new trial is directed.

APPEAL from a judgment of the circuit court for Crawford county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Action to recover on a joint and several promissory note signed by the defendants, twelve in number. The complaint was in the usual form. The defendants answered to this effect: The note was given to the plaintiffs in part payment for a stallion, represented to be a full-blooded registered animal and very valuable for breeding purposes. The plaintiffs warranted the stallion to be a good foal getter and to successfully breed more than sixty per cent. of the animals served. They represented that it was worth no less than $2,800, and proposed that defendants should purchase it, each taking a share at $200, either in cash or joint note. Relying upon the representations and warranties aforesaid the defendants and others purchased the stallion, some paying cash and others signing the note sued on. The representations aforesaid were false and the warranties breached, in that the stallion was not a full-blooded registered animal and was incapable of getting more than forty per cent. of the mares served with foal, and was not worth anything for the purpose for which it was purchased. The answer also contained other allegations to the effect that the note was obtained by fraud, closing with a prayer for judgment dismissing the action with costs and for general relief. The evidence showed without controversy that the defendants, after becoming fully informed as to the character of the horse, retained him; that they never rescinded the transaction. The court accordingly ruled that the only defense available to the defendants was a claim for damages for breach of warranty. In respect to the warranty the controversy upon the evidence, as the trial court viewed the matter, was whether the plaintiffs through their agent or by themselves warranted the horse as alleged, whether the warranty was made to all the signers of the note, whether it was oral or in writing, whether it was breached, and if so to what extent the defendants were damaged. It was claimed on the

Dunham v. Salmon, 130 Wis. 164.

part of the plaintiffs that the only warranty made was contained in a bill of sale delivered to the defendants when the sale of the horse was finally consummated. The cause was submitted to the jury for special verdict with this result: (1) The plaintiffs by themselves or their agent, Mr. Dyer, warranted the horse to the defendants as a foal getter; (2) the warranty was made to all the persons who signed the note; (3) the warranty was oral; (4) the warranty was that the horse would beget from the mares bred to him sixty per cent. of foals; (5) he begot in fact but forty-four per cent.; (6) the agreement for the sale of the horse, including the warranty, was completed before the bill of sale containing the written warranties was delivered to the secretary of the association composed of the purchasers; (7) had the horse been as represented he would have been worth $1,500; (8) he was worth in fact but $200. Exceptions were taken on the trial on behalf of the plaintiffs to rulings on evidence and to rulings on various motions, preserving for review the questions discussed in the opinion. Judgment was rendered upon the verdict in favor of the defendants, and the plaintiffs appealed.

For the appellants there was a brief by *Graves & Earll* and *Chas. H. Schweizer,* and oral argument by *Mr. J. S. Earll* and *Mr. Schweizer.*

*L. H. Bancroft,* for the respondents.

WINSLOW, J. The transaction under investigation in this case is of a kind now frequently occurring, as the records of the courts will show. A stallion of alleged high breeding and great value is proposed to be sold in shares to a number of neighboring farmers for the philanthropic purpose of raising the standard of draft-horse stock in the vicinity and incidentally of making money for the owners. An agent spends weeks or months going from house to house interviewing possible purchasers, painting in glowing terms the benefits

which must result from the venture, generally seeking to obtain subscriptions to so-called shares of stock in the enterprise, or signatures to notes for such shares, or both, upon condition that a certain required number of shares are subscribed for. The agent has many talks, now with one man in the field, and again with two or three together at the village store or saloon. At these talks there is always more or less puffing of the horse, and word-painting of the probable profits of the venture varying according to the intellectual and artistic abilities of the agent. Finally the requisite number of subscriptions or signatures is obtained and a meeting of the subscribers held where the deal is consummated, the money and notes turned over and the printed pedigree delivered, and a more or less formal association of the subscribers perfected. When, in the course of a year or more, the notes are presented for payment it is frequently found that the roseate pictures painted by the agent have not been fully realized, the expected profits have not appeared, the virtues of the horse as a breeder have not come up to the confident predictions of the agent, the recollections of the subscribers as to the inducements held out to them by the agent differ widely from the recollections of the agent, and the matter comes before the courts for settlement upon an issue of fraud or broken warranty.

In a general way the present transaction seems to have followed the course indicated. The plaintiffs are importers and breeders of horses at Wayne, Illinois. They proposed to sell an imported Percheron stallion named Preval to an association to be formed composed of farmers and other citizens residing at or in the neighborhood of Soldiers' Grove in this state at the price of $2,600. One Dyer made the canvass, beginning his labors in the month of December, 1902, and claiming to have sold the necessary amount of shares April 30, 1903. He seems to have secured individual notes from some subscribers, as well as the joint note in suit signed by the defendants.

Some of those who went into the enterprise declined to give notes, but preferred to pay cash. A meeting was held May 7th at Soldiers' Grove at which most of the subscribers were present. Dyer testifies that all the notes were signed during the last days of April or first days of May and before the meeting. At the meeting Dyer was present, some cash was paid, Dyer either already had or there received the notes, an organization of the subscribers was effected, a president and secretary elected, Dyer gave the secretary some printed by-laws and blank stock certificates, also the pedigree of the horse; and *Erie,* who had been elected secretary, asked him where the guaranty was which he promised to show that the horse would get sixty per cent. of the mares served with foal. Dyer then produced a paper looking like a mortgage, which *Erie* says he did not read, and marked "sixty" on it and handed it to *Erie,* who immediately put it away in a drawer in a desk. *Erie* further says that this paper was soon afterwards destroyed by mice and he never read it. None of the subscribers ever read it. A paper was produced by the plaintiffs on the trial which was proven to be a copy of the paper so delivered and was introduced in evidence. It consists of a formal bill of sale of the horse from the plaintiffs to the Soldiers' Grove Percheron Horse Company, and contains a special warranty to the effect that, if the horse does not get fifty per cent. of the mares served with foal during the first full season, the plaintiffs will furnish to the company another stallion of *equal quality* in exchange upon return of the stallion in question at a certain time and place accompanied with certain proofs showing the failure. The horse was turned over to the association immediately after this meeting and was operated by their agents during the seasons of 1903 and 1904. There is neither pleading nor proof to the effect that it was ever returned, or offered to be returned, to the plaintiffs.

The answer contained allegations of breach of warranty

and of fraud in the sale. As there was no attempt to prove any return, or offer to return the horse, the court ruled that the question of fraud was not in the case. This was manifestly correct, because there could be no rescission on the ground of fraud without a return of the horse or an offer to return him. Thus, the only defense was the defense of breach of warranty. As the written warranty was a special warranty, only binding the plaintiffs to furnish another stallion upon condition of the return of the horse at a certain time and place, that also dropped out of the case, and the defendants were obliged to prove a separate oral warranty and its breach in order to make good their defense. There was an attempt made to prove the making of an oral warranty by the agent, Dyer, to the defendants prior to the meeting of May 7th, and the jury found, in answer to the first four questions of the special verdict, that an oral warranty that the horse would get sixty per cent. of the mares bred to him with foal was made to all the defendants. These findings were challenged as unsupported by the evidence, and this raises the first serious question in the case.

The defense of broken warranty is an affirmative defense, and, in order to justify these findings, there must be proof that the oral warranty was made to each one of the defendants. Proof that it was made to one individually raises no inference that it was made to others. Careful examination of the evidence shows that there was no proof showing the making of an oral warranty to more than four of the defendants, to wit, the defendants *Cutler Salmon, J. M. Dull, G. W. Townsend,* and *A. D. Smith.* These last-named defendants testified directly that Dyer orally guaranteed that the horse would get sixty per cent. of foal, but none of them testified that this oral warranty was made to any one except himself. Two defendants, viz., *Oscar Jeide* and *C. P. Fortney,* gave no testimony in the case, nor was there any testimony that any oral warranty was made to either of them. The defendant

*N. N. Peterson* was a witness, but did not testify on the subject, nor was there any testimony that any warranty was made to him. The defendant *John Tilley* testified that he heard nothing about the capacity of the horse as a foal getter, and the defendant *Henry Munyon* testified that he heard nothing particular about the horse. The defendants *James J. Erie* and *H. T. Fortney* testified affirmatively that they understood from Mr. Dyer that there was to be a written guaranty, although upon redirect examination they wavered somewhat. Thus it appears that there is no testimony that any oral warranty was made except as to four of the defendants, and hence that the verdict finding that it was made to the whole twelve is unsupported by any evidence. But, even if there were evidence tending to show that the agent made an oral warranty to each and all of the defendants, a well-established legal principle not noticed by the trial court or referred to in the briefs would still stand in the way of the defense. The sale was made by an agent, and it is settled in this court that in such case the vendee, in order to enforce an alleged express warranty claimed to have been made by the agent, must prove either that the agent had express authority from his principal to make it or that such sales are usually attended with such a warranty. *Westurn v. Page,* 94 Wis. 251, 68 N. W. 1003; *Waupaca E. L. & R. Co. v. Milwaukee E. R. & L. Co.* 112 Wis. 469, 88 N. W. 308; *Matteson v. Rice,* 116 Wis. 328, 92 N. W. 1109. Here there was no proof that such warranties are customary in such transactions, or that the agent had express authority to make the warranty claimed. On the contrary, there was affirmative uncontradicted evidence that the agent, Dyer, had no authority to make any warranty except the written one. Another principle which received no attention in the trial court is also to be considered in connection with the alleged oral warranty. If, as considerable testimony tends to show, the defendants understood that the talks had with them by the agent, Dyer, were merely tentative, and

that the transaction was only to be consummated after the required number of subscribers had been obtained, and then only with a voluntary association of all subscribers then to be formed, it is manifest that the written contract of warranty given at that meeting would supersede and take the place of any oral promises of warranty made to individual subscribers. This proposition was not placed before the jury either by question or instruction, but it is evidently a vital one upon the question of the alleged oral warranty.

Two alleged errors in the admission of testimony remain to be considered. The plaintiff *Charles R. Coleman* was placed on the stand by the plaintiffs, and testified that the plaintiffs owned the note, stated the amount due thereon, and that a bill of sale with warranties was given with the animal. Upon cross-examination he was asked whether he did not, at a certain place, offer Atley Peterson a share in the horse for nothing if he would allow the use of his name to influence others. The witness replied that he never did, and, after his reply was made, a general objection was made and overruled and exception taken. On the part of the defense Atley Peterson was put on the stand, and was asked what offer *Coleman* and Dyer made to him with reference to a share in the horse at the place named. The question was objected to as incompetent, irrelevant, and immaterial, and defendants' counsel stated that it was offered to impeach *Mr. Coleman,* and on this ground the objection was overruled, and Mr. Peterson stated that they offered him a share in the horse free if he would sign the subscription and give them the use of his name. The question asked of *Mr. Coleman* could only be relevant as tending to show fraud in the sale or as tending to contradict some previous statement which he made. But, as we have seen, there was no issue of fraud in the case, and *Mr. Coleman* had given no testimony which the alleged statement tended to contradict, and hence the question was irrelevant. However, as no objection was made to the question

until after it was answered, and there was no motion to strike out the answer, the plaintiffs are not in position now to take advantage of the fact that the question was answered. But objection was properly made to the contradicting testimony of Mr. Peterson, and this objection should have been sustained. The question asked of *Mr. Coleman* did not relate to a relevant fact, and hence his answer could not be contradicted even for the purposes of impeachment. *Waterman v. C. & A. R. Co.* 82 Wis. 613, 52 N. W. 247, 1136. Certain witnesses were allowed against objection to testify that some of the colts gotten by the horse had defects, such as puffed hind legs, or crooked legs, or were not average colts. It is not claimed that any warranty was given as to quality of the colts, and we have been unable to see the materiality of this testimony. The plaintiffs moved to strike out the answers to questions 3, 4, and 6 of the special verdict and insert answers favorable to the plaintiffs, and for judgment on the verdict as so corrected, and we have entertained some doubt whether we should not, upon reversal, direct the entry of judgment for the plaintiffs, as in *Muench v. Heinemann,* 119 Wis. 441, 96 N. W. 800, and *Hay v. Baraboo,* 127 Wis. 1, 105 N. W. 654. This should only be done, however, where it conclusively appears that in no event could a new trial otherwise result. *Hay v. Baraboo, supra.* In the present case we are not satisfied that it so appears. As indicated in this opinion, there are legal principles involved which were not appreciated by the parties or the trial court, and it is not improbable that upon a new trial there may be further testimony on lines not covered in the first trial. We shall therefore direct a new trial.

*By the Court.*—Judgment reversed, and action remanded for a new trial.