# CASES DETERMINED

# August Term, 1903.

Lowe, Plaintiff in error, vs. The State, Defendant in error.

*February 28—September 8, 1903.*

*Criminal law and practice: Assault with intent to kill: Continuance: Loss of jurisdiction: Waiver: Verdict: Evidence: Witnesses: Cross-examination: Prejudicial error: Impeachment of witnesses: Insanity: Physicians and surgeons, qualifications as experts: Hypothetical questions: Instructions to jury: Intent: Reading extracts from opinions of supreme court.*

1. In a prosecution for an assault with intent to kill, after the jury impaneled to try a special plea of insanity had disagreed and been discharged, the court forthwith ordered "the trial upon the plea of not guilty to proceed." Two days thereafter an order was made and entered, with the consent and concurrence of the accused and his attorney, continuing the cause until the next term of court. *Held*, that thereby the accused waived any objection to such continuance, and that the court did not thereby lose jurisdiction.

2. In a criminal prosecution the information, by appropriate allegations, charged the accused with having made an assault upon L. with a loaded revolver and a razor, "with intent then and there, feloniously, and of his malice aforethought, to kill and murder the said L." The verdict was: "We, the jury impaneled to try the issues in the above entitled action, find the defendant guilty." *Held*, that the verdict was not defective, but found the accused guilty of the offense charged in the information.

3. In a prosecution for assault with intent to kill, a plea of insanity of the accused was interposed. A witness for the prosecution, on cross-examination, among other things, testified that

she might have said on a former trial, that on the morning of the assault the accused looked pale, considerably more than usual; that he had one of his funny jealous spells; that it was a fact that she thought him jealous; that she always said he was awful jealous; that his look was more unusual that morning than before; that his strange look that morning made her watch him, and that he did not look as he ought to that morning. *Held*, that it was not prejudicial error to refuse to allow such witness, on further cross-examination, to testify as to whether, on the preliminary examination, she had not stated that the accused had jealous spells about every two weeks; the court ruling that it was improper on such cross-examination to go generally into the life of the accused, but that the defense was at liberty to inquire as to anything connected with his conduct on the morning in question, and perhaps the evening before, or any past experience which might explain his conduct.

4. In a prosecution for assault with intent to kill his wife, in which the accused interposed a plea of insanity, B., a witness for the prosecution, testified that he saw the accused buying a revolver and a box of cartridges at a hardware store prior to the commission of the offense, and that on such occasion the accused stated to witness that he "was having a hell of a time with the old woman," that he had "drawn the wood away from the house, that she could freeze to death, and that the next time he had a row" with her (using an opprobrious epithet), "he would fill her head so full of lead that she would not know where she was standing;" that he told L., a witness afterwards called for the defense, that the accused did not appear to have been drinking, but he could not remember stating to L. that he believed the accused was insane at the time he bought the revolver. *Held*, that the mental condition of accused, as he appeared to B. at the time, was necessarily for the consideration of the jury, and it was error to refuse to permit L. to answer the question: Did he (B.) say to you, in that conversation, that he believed the defendant was insane?

5. In a criminal prosecution the accused having interposed a plea of insanity, a medical expert, called by the accused, in answer to a hypothetical question, stated that the accused was insane. Thereupon the court asked him the question: "What would you say, doctor, of the 300 men who burned the negro at the stake; stood there, and lighted the fire, and stood by when he was begging to be shot; waited around, and watched the flames lick up his body—what would you say about the sanity

of those men?" *Held*, that such question was improper, and its answer irrelevant.

6. In such case, it is the duty of counsel to call the court's attention to the impropriety of the question at once, so that it may be immediately corrected. But failing to make such objection, and take exception thereto, the error thereby committed cannot be available in the appellate court.

7. A medical witness, offered as an expert, is competent to testify on the subject of insanity, when it appears that he has graduated from a regular medical college, has a license to practice medicine from the state board, has practiced eighteen months, has had opportunity to see and study insane patients during his medical course, and during his practice has treated four patients for insanity.

8. Under the provisions of sec. 585, Stats. 1898 (providing that no physician shall be appointed examiner in lunacy unless he has certain enumerated qualifications, including three years' experience in the practice of his profession, or one year's experience in a hospital for the insane after his graduation), a physician who has had only eighteen months' experience in the practice of his profession, and no experience in a hospital for the insane after graduation, is competent to testify as a medical expert.

9. When a hypothetical question put to an expert is objected to as incompetent, and as not based upon the evidence in the case, it is error to overrule such objection, where there is no testimony to sustain the facts stated in the question as the basis for the conclusion asked.

10. On the trial on an issue of insanity, pleaded by the defendant charged with an assault with intent to kill, nonexpert witnesses, who were acquainted with and had business dealing with the accused, may testify to their opinions as to his sanity or insanity.

11. In a prosecution for assault with intent to kill, the court instructed the jury: "If the jury believes from the evidence, beyond a reasonable doubt, that the defendant did shoot his wife and cut her throat as charged in the information, and that the natural, probable and ordinary consequences of such acts would be the death of such wife, and that defendant was of sound mind at the time he committed these acts, then the *presumption of law* is that the defendant did so assault his wife with intent to kill her; and if such assault and shooting, under the circumstances, was done with the premeditated design to effect the death of said wife, the defendant being sane at the time, the jury should find the defendant guilty, as

charged." *Held*, that there was no prejudicial error in giving such instruction, although it was subject to the criticism that the jury were thereby told that the facts therein recited *raised a presumption of law* that the accused did so assault his wife with intent to kill her.

12. In a criminal prosecution where the accused interposes the defense of insanity, it is not error to instruct the jury: "Insanity means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or not conscious at the time of the nature of the act he is committing; and where, though conscious of it, and able to distinguish between right and wrong, and knowing that the act is wrong, yet his will—by which is meant the governing power of his mind—has been, otherwise than voluntarily, so completely destroyed that his actions are not subject to it, but are beyond his control."

13. In such case, it is not error to instruct the jury, that it is not to be inferred that a person is insane from the mere fact of his committing the crime, or from the enormity of the crime, or the absence of adequate motive.

14. In such case, it is not error to instruct the jury: "Moral or emotional insanity does not exempt a person from criminal responsibility. Mere moral insanity, or temporary frenzy or passion, arising from excitement or anger, and not from mental disease, is not an excuse for crime."

15. In a criminal prosecution where the accused has pleaded insanity, it is error to read extracts from an opinion of the supreme court, rendered in an equity action to set aside a will on the ground of insanity of the testator. The two cases are so broadly distinguishable in their facts as to make the extracts read inapplicable to the criminal prosecution, and hence misleading to the jury.

16 Error cannot be assigned on refusal to give requested instructions that are substantially covered by the instructions given.

ERROR to review a judgment of the circuit court for Clark county: JAMES O'NEILL, Circuit Judge. *Reversed.*

The plaintiff in error was charged with having on June 12, 1899, made an assault upon his wife, Amanda Lowe, while armed with a revolver and razor, with the intent to kill and murder her. To such information he entered a plea of not guilty, and with such plea he also made and filed a special plea, alleging his insanity at the time of the alleged offense.

The special plea was tried April 25, 1900, and the jury were unable to agree upon a verdict, and were thereupon discharged from further consideration of the case. Thereupon, and on April 25, 1900, the court made an order (entered in the clerk's minutes) forthwith ordering the trial to proceed upon both pleas—that of not guilty, and also the special plea—but nothing was done until April 27, 1900, when, with the consent and concurrence of the accused and his attorney, an order was made and entered in the clerk's minutes, continuing the cause until the next regular term of the circuit court, which was appointed to be held in October, 1900. Subsequently, a jury trial was had on both pleas, and at the close of such trial, November 30, 1900, the jury returned a verdict of guilty. The court denied successive motions to arrest the judgment and for a new trial. December 12, 1900, and at the same term of the court, the accused was, by the judgment of the court, sentenced to the state prison for the term of eight years. To reverse such judgment and sentence the accused sued out this writ of error.

It appears from the record, and is undisputed, that the accused at the time of the trial was fifty-four years of age; that he lived in England and Rhode Island most of the time, working in cotton mills, until he was twenty-eight years of age, when he came with his first wife to Jackson county; that he only had three months' schooling; that he lived with his first wife about eight years, and had by her six children; that he was divorced from her; that he thereupon moved to Neillsville, in Clark county, where he was engaged in the butcher business, and where the offense was committed, and married his second wife, but was divorced from her soon afterwards; that thereupon he married his third wife, Amanda Lowe, mentioned, in March, 1897, and separated from her in September, 1897, but afterwards came back to her, and lived with her until in June, 1899; that he had no children by his second or third wife, and all three wives were women of irre-

proachable character, absolutely above any suspicion of infidelity; that June 10, 1899, the accused told his wife, Amanda, to pack up and go, as they could not get along together, but that instead of doing so at that time, she went to the house of her son by a former marriage, near by, and remained there until the morning of June 12, 1899, when she went back to her husband's house, and commenced to pack up; that with her at the time were Mrs. Ray Carlton and Mrs. Bertha Montgomery, daughters of Mrs. Lowe, and two small children of Mrs. Montgomery; that while Mrs. Lowe was in the bedroom, packing her belongings, where the accused was at the time, and when her back was turned toward him, he shot her in the back of the head, and she fell to the floor, and while lying on the floor he fired two or three other shots, one of which inflicted another wound in the head; that the accused thereupon walked into the kitchen, and fired two shots at himself, inflicting but slight wounds in his chin and forehead; that Mrs. Carlton thereupon ran from the house in search of assistance, and Mrs. Montgomery, who witnessed the entire occurrence, succeeded in disarming the accused of the revolver; that thereupon the accused started for the room where his wife was lying, and in spite of the efforts of Mrs. Montgomery, cut his wife's throat with a razor, severing the windpipe and the front half of the gullet, and also the anterior jugular and the right external jugular; that in such condition Mrs. Lowe, with the assistance of Mrs. Montgomery, made her escape, and succeeded in reaching the house of a neighbor, where medical assistance was procured, and she recovered; that the accused was in the habit of addressing his several wives in terms of the vilest obscenity and most disgusting profanity.

*R. J. MacBride,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *L. H. Bancroft,* first assistant attorney general; and oral argument by *Mr. Bancroft.*

CASSODAY, C. J.   There is no claim that the evidence is insufficient to support the verdict.   Counsel for the accused insists, however, that "the evidence was amply and abundantly sufficient to carry the question of the accused's insanity to the jury."   Numerous errors are assigned.

1. It is claimed that the court lost jurisdiction because two days after the jury had disagreed and been discharged on the trial of the special issue of insanity, and the court had forthwith ordered "the trial upon the plea of not guilty to proceed" as prescribed by the statute (sec. 4697, Stats. 1898), an order was made and entered, with the consent and concurrence of the accused and his attorney, continuing the cause until the next term of the court.   Counsel for the accused frankly concedes that such consent and concurrence was as broad and ample as possible, but suggests that by such continuance the court lost jurisdiction.   There is nothing in the statutes prohibiting such continuance, and it is very manifest that the ends of justice and the rights of the accused might imperatively require such continuance.   In all criminal prosecutions, the accused is entitled, as a constitutional "right, to a speedy public trial" in "the county or district wherein the offense shall have been committed" (sec. 7, art. I, Const.) ; and yet this court has held that such right "is waived by the accused when, upon his application, the place of trial is changed to another county."   *Bennett v. State,* 57 Wis. 69, 75, 14 N. W. 912; *Wheeler v. State,* 24 Wis. 52.   Certainly, the court did not lose jurisdiction by such continuance of the case at bar.   We perceive no good reason why the consent and concurrence of the accused and his attorney to such continuance was not a waiver of any objection to the same.

2. We find no reason for arresting the judgment on the ground of defective verdict.   The information, with appropriate allegations, charges the accused with having made an assault upon Amanda Lowe with loaded revolver and razor, "with intent then and there, feloniously, and of his malice

aforethought, to kill and murder the said Amanda Lowe."
The verdict is that "We, the jury impaneled to try the issues
in the above-entitled action, find the defendant guilty." Such
verdict, in effect, found the accused guilty of the offense
charged in the information.

3. Error is assigned because a witness for the prosecution
(Bertha Montgomery) was not allowed on cross-examination
to testify as to whether, on the preliminary examination, she
had not stated that he had jealous spells about every two
weeks. She had already testified, on cross-examination, that
she might have said on the former trial, in effect, that on the
morning of the assault the accused looked pale, considerably
more than usual; that he had one of his funny jealous spells;
that it was a fact that she thought he was jealous; that she
always said he was awfully jealous; that his look was more
unusual that morning than before; that she did not expect to
find him at home that morning, as she knew he was having
one of his funny jealous spells; that his strange look that
morning made her watch him; and that he did not look as he
ought to on that morning. The ground stated for excluding
such further cross-examination is to the effect that it was im-
proper on such "cross-examination to go generally into the
life of" the accused; but that the defense was at liberty to
inquire as to anything connected with the conduct of the ac-
cused on the morning in question, and perhaps the evening
before, or any past experience which might explain the con-
duct of the accused. We perceive no prejudicial error in
such ruling.

4. Error is assigned because the court refused to allow the
accused to prove that one Martin Bigger, a witness for the
prosecution, made statements out of court contrary to his tes-
timony in court. He testified to the effect that three or four
months prior to the assault in question, the accused was at
Merrillan, and he saw him buy a revolver and a box of car-
tridges at a hardware store; that he and the accused then

walked out of the store together; that the accused said "that
he was having a hell of a time with his old woman;" that he
had drawn "the wood away from the house, and she could
freeze to death;" that he then advised the accused to leave
his wife, if he could not live in peace with her; that the ac-
cused then said, in effect, that he had quit her; "that the next
time he had a row with the damned old bitch he would fill her
head so full of lead that she would not know where she was
standing;" that he advised the accused against doing so, and
to leave her if he could not live peaceably with her; that that
was the last he saw of him.   On cross-examination he testi-
fied to the effect that the accused did not seem to be intoxi-
cated, had not been drinking, did not act strange; that he met
a brother of the accused, Joseph Lowe, at Merrillan, before
the examination of the accused before the justice; that he
then told Joseph that he saw the accused buy the revolver in
the hardware store, but did not think he told him all the re-
marks the accused made at the time; that he did not think he
told Joseph to look out for the accused, that he was not right,
that he believed he was insane—not exactly that; that Joseph
said the accused was always crazy on the woman question;
that he said to Joseph that a man must be either drunk or
crazy to do such a thing as that, but did not remember of
telling him that he believed the accused was insane at the
time he bought the revolver; that he might have said that he
thought there was something the matter with a man talking as
the accused did when he bought the revolver; that he had a
conversation with Joseph afterwards, at Neillsville, at the
time of the examination before the justice; that Joseph then
asked him what he knew about the "scrap," and he told him
he was with the accused when he bought the revolver, and that
a man who would do such a deed was either drunk or crazy
(a remark a man would make in talking), but did not say
that the accused was crazy or drunk; that he did not remem-
ber talking with Joseph again about their conversation at

Merrillan; that he did not think he told him that the accused was crazy when he bought the revolver. Joseph Lowe, brother of, and witness for, the accused, testified to the effect that he had but one conversation with the witness Bigger at Merrillan about the accused buying the revolver; that that was before the shooting, and might have been at the time mentioned. by Bigger; that in that conversation Bigger related to him the circumstances and conversation he had with the accused. Thereupon he was asked this question: "Did he say to you,. in that conversation, that he believed the defendant was insane?" On being objected to as incompetent, irrelevant, and. immaterial, the same was excluded. Counsel for the accused then insisted that, as Bigger had attempted to narrate a conversation had with the witness Joseph Lowe, he was entitled to have the whole of that conversation; but the objection was. sustained. Such ruling was based upon the theory that it was "not of the slightest importance" as to "what Mr. Bigger's. belief was as to the sanity of the" accused; that "the state did not call him for the purpose of asking him his opinion as to the sanity or insanity of the" accused, but that "out of liberality of cross-examination" he was permitted to make the "statement as to his belief" mentioned. It was certainly competent to cross-examine Bigger in respect to statements made by him out of court, to lay the foundation for his contradiction by way of impeachment. *Perkins v. State,* 78 Wis. 551, 559, 47 N. W. 827. The question recurs whether the statement sought to be contradicted was relevant to the issue.

One of the issues on trial was as to the sanity of the accused. The only hope of the accused seems to have been based upon the determination of that issue. The testimony of Bigger tended to prove that a short time before the shooting the accused bought the revolver, with the avowed purpose of shooting his wife. Of course, he could have no such intent

unless he was of sane mind at the time he bought the revolver, and told Bigger what he did. Bigger had testified to the effect that the accused did not appear to have been intoxicated, nor that he had been drinking, and did not act strange. Such testimony left the jury to infer that the accused was sane at the time he bought the revolver and made the statement mentioned, and that Bigger so regarded him. The mental condition of the accused, as he appeared to Bigger at the time, was necessarily for the consideration of the jury. *Comm. v. O'Brien,* 134 Mass. 198; *Comm. v. Hayes,* 138 Mass. 185; *Smalley v. Appleton,* 70 Wis. 340, 344, 35 N. W. 729; *Bridge v. Oshkosh,* 71 Wis. 363, 367, 37 N. W. 409; *Keller v. Gilman,* 93 Wis. 11, 66 N. W. 800. If Bigger told Joseph Lowe that he believed the accused was insane at the time he bought the revolver, then such statement was inconsistent with Bigger's testimony given in court upon a relevant issue; and hence it was competent to impeach the credibility of Bigger by showing that he made statements out of court inconsistent with those made in court. *Welch v. Abbott,* 72 Wis. 512, 40 N. W. 223; *Waterman v. C. & A. R. Co.* 82 Wis. 613, 628, 629, 52 N. W. 247, 1136. We must hold that the exclusion of such testimony was error.

5. Dr. Lyman, superintendent of the Hospital for the Insane at Mendota, was called as a medical expert witness on the part of the accused, and in answer to a hypothetical question, testified to the effect that in his judgment the accused was insane at the time of the shooting, June 12, 1899. Then, after being cross-examined by the state to the extent of twenty-one type-written pages, the court asked him this question:

"What would you say, doctor, of the three hundred men who burned the negro at the stake in Colorado; stood there, and lighted the fire, and stood by when he was begging to be shot; waited around, and watched the flames lick up his body—what would you say about the sanity of those men?"

The witness answered:

"I should think they were sane; that they were acting under what we call 'mob influence' at the time, and their emotions got the better of them."

We agree with counsel that the question was improper and the answer irrelevant; but it is conceded that no objection was made, much less an exception taken. This court has, from the beginning, refused to review rulings upon the trial of criminal cases, as well as civil, to which no exception was taken. *Knoll v. State,* 55 Wis. 249, 12 N. W. 369; *Rollins v. State,* 59 Wis. 55, 17 N. W. 689; *Grottkau v. State,* 70 Wis. 462, 472, 36 N. W. 31; *Porath v. State,* 90 Wis. 537, 63 N. W. 1061; *In re Roszcynialla,* 99 Wis. 537, 538, 75 N. W. 167, 168. In this last case it is said:

"In the trial of causes, as well as other matters conducted by human agencies, there will, unavoidably, be more or less inadvertence, irregularity, mistake, impropriety, and error. . . . By reason of these things, parties and their counsel, in criminal as well as civil cases, are required to bring any supposed impropriety or error to the attention of the court, and obtain a ruling or action thereon, at the earliest opportunity, in order to become available. Even then, the party feeling agggrieved must promptly take, and preserve in the record, his exception, or the supposed error will be deemed waived."

Counsel says that "it is sometimes a delicate thing for counsel to object to a question asked by the court." The authorities all seem to agree that the trial judge has the right to ask questions of witnesses when, necessary to elicit the truth. See note to *South Covington & C. St. R. Co. v. Stroh,* 57 L. R. A. 878 *et seq.;* citing numerous adjudications. But if the trial judge asks an improper question, then it becomes the duty of counsel to call his attention to it at once, so that it may be immediately corrected. By reason of the failure to make such objection and take such exception,

the error in admitting such testimony is not here available
to the accused.

6. Error is assigned because Dr. Conroy was permitted to
testify as a medical expert. The objection is upon two
grounds. One is said to be his lack of experience in such
matters. It appears that he had graduated at a regular medi-
cal college, and had a license to practice medicine from the
state board of this state, and had practiced therein for eight-
een months; that the medical college he so attended had an
insane pavilion, which would accommodate about thirty pa-
tients; that while he was there he had an opportunity to see
and study, and did study, about one hundred such cases; that
during his practice of eighteen months he had had four such
cases to treat. Such actual experience certainly made him
competent to testify within the rulings of this court. *Stilling
v. Thorp,* 54 Wis. 528, 534, 535, 11 N. W. 906; *Boyle v.
State,* 57 Wis. 472, 15 N. W. 827; *Soquet v. State* 72 Wis.
659, 40 N. W. 391; *Zoldoske v. State,* 82 Wis. 580, 605, 52
N. W. 778. The other ground upon which such objection is
made is that the witness was precluded by the statute, which
provides that "no physician shall be appointed such examiner
in lunacy" of applicants for admission to the State Hospital
for the Insane, "unless he shall be a graduate of a legally in-
corporated medical school, and shall have had at least three
years' experience in the practice of his profession, or shall
have had one year's experience as physician in an insane hos-
pital after his graduation, and shall be registered by such
county judge as thus qualified on a list to be kept for that
purpose in his office." Sec. 585, Stats. 1898. The proceed-
ings prescribed by that section are special, and practically
*ex parte.* That section does not prescribe the competency of
physicians or surgeons to testify as witnesses in courts of jus-
tice. This is manifest, not only from the language of that
section, but from other sections of the statutes. Thus a phy-

sician or surgeon is precluded from the right to collect fees or compensation for services or for testifying in a professional capacity, unless he had received a diploma from a medical college, or a license from the state board of medical examiners, as prescribed. Sec. 1436, Stats. 1898. By another section of the statutes, it is provided that any person thus prohibited "from testifying in a professional capacity as a physician or surgeon" is punishable if he "shall assume the title of doctor of medicine, physician, or surgeon by means of any abbreviation, or by the use of any word, words, letter, or letters . . . or by any device whatsoever." Sec. 4603a, Stats. 1898. *Schaeffer v. State,* 113 Wis. 595, 89 N. W. 481; *Allen v. Voje,* 114 Wis. 1, 8, 9, 89 N. W. 924. We must hold that Dr. Conroy was competent to testify as a medical expert.

7. In answer to some twenty odd assumptions of fact, Dr. Conroy testified that in his opinion the accused was sane at the time of the shooting. The same witness was then asked this question:

"If you were to assume that for the period of twelve months immediately preceding his second marriage, defendant kept company with the woman who afterwards became his second wife, at which time he had a wife living, and she had a husband living, and neither of them were divorced, would that strengthen your opinion as to his sanity."

It was "objected to as incompetent, and as not based upon the evidence in the case." The objection was overruled, and the accused excepted. The witness answered that "it would." Counsel for the accused denied that there was any such testimony in the record, and in his brief requested counsel for the state to point out such testimony, if there was any; but no attempt has been made to point out any such testimony, and after a good deal of examination we fail to find any. The record contains nearly 500 type-written pages of testimony. If there is any such testimony in the record, it was the duty

of counsel for the state to point it out. Having failed to do so, and having failed to find any ourselves, we must assume that there is no such testimony. This being so, we must hold that the objection was improperly overruled. Upon the same assumption, and against objection, the witness answered that in his opinion the accused was able to distinguish between right and wrong June 12, 1899.

8. Error is assigned because numerous non-expert witnesses, who testified as to their acquaintance and dealing with the accused, mostly in buying meat from him at the shop, and seeing him at various times, were allowed to give their opinion, based upon such business relations with the accused and his appearance, as to his sanity or insanity. The admissibility of such testimony is fully sanctioned by numerous and recent decisions of this court. *Burnham v. Mitchell,* 34 Wis. 117, 133; *Crawford v. Christian,* 102 Wis. 51, 78 N. W. 406; *In re Guardianship of Welch,* 108 Wis. 387, 394, 84 N. W. 550; *In re Butler's Will,* 110 Wis. 70, 76, 77, 85 N. W. 678.

9. Error is assigned because the court charged the jury:

"If the jury believes from the evidence, beyond a reasonable doubt, that the defendant did shoot his wife and cut her throat as charged in the information, and that the natural, probable, and ordinary consequences of such acts would be the death of such wife, and that defendant was of sound mind at the time he committed these acts, then *the presumption of law* is that the defendant did so assault his said wife with intent to kill her; and if such assault and shooting, under these circumstances, was done with the premeditated design to effect the death of said wife, the defendant being sane at the time, the jury should find the defendant guilty, as charged."

The particular criticism is that, by the instruction so given, the jury were told that the facts therein recited raised a "presumption of law" that the accused "did so assault his wife with intent to kill her." Counsel concedes that a person of "sound mind is responsible for the consequences of his acts," but insists that such acts "must be acts done—acts accom-

plished;" that "the law does not presume a felonious intent
from the shooting," nor from "the use of deadly weapons;"
that the "intent, in a case of this kind, is a fact to be pleaded,
proved, and found" by the jury, and is not presumed as a mat-
ter of law. In support of such contention counsel cites,
among other authorities, the following, which are most in
point: *State v. Bloedow,* 45 Wis. 279, 280; *Roberts v. Peo-
ple,* 19 Mich. 401, 414, 415; *Patterson v. State,* 85 Ga. 131,
11 S. E. 620, 21 Am. St. Rep. 152, and note 155; *People v.
Landman,* 103 Cal. 577, 37 Pac. 518; Abbott's Trial Brief
(2d ed.) 677, 678, No. 74; Lawson's Presumptive Evidence,
331, rule 66; Wharton, Criminal Evidence, § 764. In the
case in this court it was held:

"In criminal law, when a special intent, beyond the nat-
ural consequences of the thing done, is essential to the crime
charged, such special intent must be pleaded, proved, *and
found.*"

Ryan, C. J., there said:

"Surrounding circumstances generally go far to show" the
intent. "Sometimes the very act itself does. Thus, if one
shoot another with a rifle in a vital part of the body, the act
raises a presumption of intent to kill, unless the circumstances
under which it is done go to repel the presumption."

In the Michigan case cited, it was held:

"When a statute makes an offense to consist of an act com-
mitted with a particular intent, which act and intent consti-
tute, substantially, an attempt to commit a higher offense than
that which was accomplished, proof of the particular intent is
as necessary as of the act itself; but not, necessarily, by di-
rect and positive testimony. It may be inferred from any
facts in evidence which satisfy the jury of its existence."

In that case it was said by the court:

"No intent in law, or mere legal presumption, differing
from the intent in fact, can be allowed to supply the place
of the latter."

That case has received repeated sanction in that state, the latest being *People v. Ochotski,* 115 Mich. 601, 606, 73 N. W. 889. In the Georgia case cited, the assault was with a weapon likely to produce death, but did not; and it was held that malice in an assault by stabbing did "not raise a presumption of an intent to kill." In a note to the case, it is said that, "to constitute the offense of an assault with intent to commit murder, a specific intent upon the part of the accused to take life is necessary."

In Abbott's Trial Brief, cited, it is said:

"The presumption of criminal intent, even where it has been shown that the act charged was done with the knowledge of the facts, is not a presumption of law, but is a question for the jury. It is error to instruct them that the law presumes a criminal intent. They may be instructed that from such facts they may infer criminal intent; but where a specific intent is necessary to make the act criminal, the specific intent cannot be inferred from the act."

That is quite similar to Lawson's rule 66, cited above, which is:

"Where a specific intent is required to make an act an offense, the doing of the act does not raise a presumption that it was done with the specific intent."

But that rule is mentioned as an exception to the general rule, just previously stated, by the same author, as follows:

"Where an act is criminal *per se,* a criminal intent is presumed from the commission of the act." Lawson, Presumptive Evidence, 327, Rule 65.

In support of that rule, the author cites a number of cases, including one from Massachusetts, from which he quotes at length, and where the opinion of the court was written by SHAW, C. J., and in which it was held:

"When on the trial of an indictment for murder, the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious, and an act of murder, and proof of matter of

excuse and extenuation lies on the defendant." *Comm. v. York,* 9 Met. 93, 102.

The learned Chief Justice there said:

"The effect of the rule presented to the jury was that, if it was proved beyond reasonable doubt that the defendant had wilfully and voluntarily inflicted a mortal wound upon the deceased, malice was to be inferred from this act, unless such facts were proved, by a preponderance of the evidence, as would extenuate the homicide, and reduce it to manslaughter. This rule seems to rest on well-settled principles, and to be supported by a great weight of authorities."

In speaking of what the "law presumes," in the section of Wharton, cited, it is said, in effect, that "the use of the term 'law' is ambiguous, and is likely to mislead;" that "if it be said that the use of a weapon likely to inflict a mortal blow implies, *as a presumption of law,* in its technical sense, a deadly design, this is error;" that "there is no such thing as a purely abstract killing;" but that, "when a person without authority, and with the appearance of deliberation, shoots another, we infer, as a presumption of *fact* (not of *law*), design;" that "taking aim at another with a gun, by a person without authority, and not in public war, and then firing, ordinarily implies an intent to kill." A standard text-writer uses this language:

"Another cardinal doctrine of criminal law, founded in natural justice, is that it is the intention with which an act was done which constitutes its criminality. The intent and the act must both concur to constitute the crime. . . . And the intent must therefore be proved, as well as the other material facts in the indictment. The proof may be either by evidence, direct or indirect, tending to establish the fact, or by inference of law from other facts proved; for though it is a maxim of law, as well as the dictate of charity, that every person is to be presumed innocent until he is proved to be guilty, yet it is a rule equally sound that every sane person must be supposed to intend that which is the ordinary and natural consequence of his own purposed act." 3 Greenleaf, Ev. (15th ed.) § 13.

In speaking of "presumptions of law and presumptions of fact," the same author says that "presumptions of law consist of those rules which, in certain cases, either forbid or dispense with any ulterior inquiry;" and then divides such "presumptions of law into two classes, namely, *conclusive* and disputable" (1 Greenleaf, Ev. [15th ed.] § 14); whereas, "presumptions of fact . . . differ from presumptions of law in this essential respect: that while those are reduced to fixed rules, and constitute a branch of the particular system of jurisprudence to which they belong, these merely natural presumptions are derived wholly and directly from the circumstances of the particular case, by means of the common experience of mankind, without the aid or control of any rules of law whatever. Such, for example, is the inference of guilt drawn from the discovery of" the facts therein stated. Id. § 44. While there is some confusion of statement among the adjudications on the subject, yet it is safe to say, upon the great weight of authority, as well as reason, that every sane man is presumed to contemplate the natural and probable consequences of his own voluntary acts. Applying that principle to the instruction in question, and it may still be said, with some force, as argued by counsel, that the facts recited in the instruction merely raised a presumption or inference of fact that the accused "did so assault his wife with intent to kill her," instead of a presumption of law to that effect, as stated in the instruction. And yet it is manifest that the jury were only authorized to find such guilty intent in case they found the facts and circumstances mentioned in the instruction to be true; in other words, the presumption or inference of guilty intent was to be derived wholly and directly from the facts and circumstances of the case, as disclosed by the evidence and recited in the instruction. Under that instruction, the jury were only allowed to find the accused guilty of such intent in case they believed from the evidence beyond a reasonable doubt that the accused was of sound mind, that he

"did shoot his wife, and cut her throat, as charged in the information, and that the natural, probable, and ordinary consequences of such acts would be the death of such wife;" and the same instruction, as well as other portions of the charge, required the jurors, in order to convict, to find that the accused did the acts mentioned "with the premeditated design to effect the death of said wife." Thus, the jury necessarily found that the accused did the acts mentioned "with the premeditated design to effect the death of his wife," and also "that the natural, probable, and ordinary consequence of such acts" was the death of such wife. We must hold that there was no reversible error in giving the instruction quoted, although it was subject to criticism in the particular mentioned.

10. We perceive no error in charging the jury:

"Insanity means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or not conscious at the time of the nature of the act which he is committing; and where, though conscious of it, and able to distinguish between right and wrong, and knowing that the act is wrong, yet his will—by which is meant the governing power of his mind—has been, otherwise than voluntarily, so completely destroyed that his actions are not subject to it, but are beyond his control."

Such ruling has been expressly sanctioned by this court. *Butler v. State,* 102 Wis. 364, 366, 367, 78 N. W. 590; *Eckert v. State,* 114 Wis. 160, 163, 164, 89 N. W. 826. Nor do we think there was any error in charging the jury to the effect that we are not to infer that a man is insane from the mere fact of his committing a crime, or from the enormity of the crime, or the absence of adequate motive. Nor was there any error in charging the jury:

"Moral or emotional insanity does not exempt a person from criminal responsibility. Mere moral insanity, or temporary frenzy or passion, arising from excitement or anger, and not from any mental disease, is not an excuse for crime."

11. After defining insanity, as mentioned, the court read to the jury lengthy extracts from the opinion of Mr. Justice LYON in the *Chafin Will Case,* 32 Wis. 560–563. It is unnecessary to repeat what is there said. As there indicated, Bradley Chafin had many peculiarities, and entertained many opinions which were generally deemed absurd and extravagant, and his conduct in some respects was eccentric and foolish. That action was equitable in its nature, and this court held that the verdict in the trial court, to the effect that Bradley Chafin was insane, was "clearly contrary to the weight of the evidence." *Chafin Will Case,* 32 Wis. 569. True, such extracts from the opinion in that case were so given as illustrations of what a man might do and still be sane, but they were given to the jury by the trial court as the opinion and judgment of this court, and hence would naturally have a controlling influence with the jury. They were stated as principles to be followed by the jury. And yet the two cases are so broadly distinguishable in their facts as to make such extracts inapplicable to this case, and hence misleading to the jury. We must hold that the reading of such extracts to the jury was error.

12. Error is assigned because the court refused to give each of the four instructions requested. But they are all substantially covered by the charge. There seems to be no other question of sufficient importance to call for consideration.

*By the Court.*—For the errors mentioned, the judgment of the circuit court is reversed, and the cause is remanded for a new trial upon both of the issues. The warden of the state prison will surrender the plaintiff in error to the sheriff of Clark county, who will hold him in custody until he shall be discharged, or his custody changed by due course of law.

SIEBECKER, J., took no part.