PLAINSE, by Guardian, Respondent, vs. ENGLE, Appellant.*

*November 5—December 2, 1952.*
*March 6—March 31, 1953.*

* Rehearing granted, opinion on rehearing, post, p. 522a.

508

510

For the appellant there was a brief by *Backus & Backus,* attorneys, and *August C. Backus, Jr.,* of counsel, all of Milwaukee, and oral argument by *August C. Backus, Jr.*

For the respondent there was a brief by *Rubin & Ruppa* and *Gerald H. Kops,* attorneys, and *William B. Rubin* of counsel, all of Milwaukee; and oral argument by *William B. Rubin.*

GEHL, J.   Joseph W. Buellesbach who had been a real-estate broker and appraiser for about twenty-five years prior to the trial, and who was familiar with the value of Milwaukee property, testified that in his opinion the home property before improvements made on it by defendants subsequent to the conveyance, had a value of $9,200 and that the flat without improvements was worth $11,800. The defendants testified that as consideration for the conveyance of the home they paid the father $3,000 and that after the conveyance they improved and repaired it at a cost of $13,000. At one stage the defendant, Edward Engle, testified that he paid the $3,000 to the father in the latter's home and on another occasion he said that he paid it to him in the garage upon the property; that $2,000 of the purchase price belonged to Florence, who

had received it upon a policy of life insurance issued on the life of her former husband who died in 1930, and that $1,000 thereof was Edward Engle's money saved by him from his earnings. He testified that his daughter was present when the $3,000 was paid to the father but the daughter was not called as a witness to corroborate his testimony. Although it appears from the record that the father was quite meticulous in the care of his property and money and that it was his practice to deposit his receipts to the credit of his bank account, it does not appear that the $3,000 was ever deposited to his credit in any bank.

The defendants testified that as consideration for the conveyance of the flat they paid the father $5,700, but admitted that they obtained the money by means of a mortgage placed upon the flat after title thereto had been obtained by them. They testified that they expended $11,362 to repair and improve the flat after title was placed in their names.

With respect to the transactions involving the deeds it was. for the trial court to determine whether at the time of their execution the father had sufficient mental ability to know what he was doing and the nature of the act done. *Boorman v. Northwestern Mut. Relief Asso.* 90 Wis. 144, 62 N. W. 924.

Florence testified that at about the first of the year 1951 she noticed for the first time that her father was becoming "childish." Edward Engle testified that he first observed that the old man was not in his right mind at Christmas time in 1950, and that this observation followed from the fact that he was not "too enthused" about his presents.

Hedwig Rockburg, a neighbor of the parties, testified that she had visited frequently with the defendants and observed the father. She noticed no change in his condition until 1951 and that on New Year's Day of that year she noticed "something funny about him," and that since then he has been gradually slipping.

Dr. Francis Joseph Millen, a specialist in neurology and psychiatry, was admitted to practice in 1942. From 1943 until 1949 he did postgraduate work at the University of Minnesota and at the Mayo Clinic at Rochester, Minnesota, and at several hospitals and schools, specializing in training in neurology and psychiatry. He observed the father on August 9, 1951, at a hearing in the office of a court commissioner, on January 9, 1952, at a hospital to which the father had been committed. He conducted the usual, accepted, formal psychiatric examination. He arrived at the conclusion that the patient was psychotic. At the trial and after some effort was made by defendants' counsel to obtain testimony from the doctor, counsel asked that the proceedings be suspended and that the doctor be permitted to examine the father. The proceedings were suspended and such examination was made. Dr. Millen then testified that his most recent examination revealed that "Mr. Plainse has a marked defect in mentation or thinking, in concentration, in attention, in recall and memory, in orientation, particularly in place and in time, and also in judgment and insight;" that this condition sometimes comes on gradually and may sometimes occur over a period of two or three months; that he could not state what the progress of his illness was, nor what his condition was five years previous to his examination; that he could not with absolute certainty state what the mental nature of the individual was for any long period prior to the time he examined him; that it is possible for a person to be legally competent and psychotic at the same time. Upon cross-examination he testified that he could not with absolute certainty state how long his then condition predated the last examination; that it might be a year or two years or that it might be five years. Upon redirect examination he testified that it was not his opinion that his mind was defective in 1948; that he could have been perfectly well and healthy in 1948 or 1950 but that the defect in memory discovered in his examination of the patient could have come on in 1951;

that it was his opinion that his mind was not defective in 1948 and that it could have been perfectly clear in 1948. On recross-examination he testified that his mind may have been defective in 1948 and that it may also have been defective prior to that year. He described the patient's condition as "senile psychosis" and stated that he could not say how long he had been suffering from that ailment. From statements made by others to him, he formed his opinion that the onset of the psychosis was on January 1, 1951.

He testified that in 1948 when the father signed the first deed he could have been competent and he could have known what he was doing and the reason and the nature of it and the reason for it; that he could have been incompetent at that time too; that he was incompetent at the time of the trial and that he could not state with absolute certainty how far back that incompetency extends.

From the foregoing it is apparent that the witness either did not or could not venture a firm opinion as to the mental condition of Mr. Plainse from the time the first deed was executed in July, 1948.

The proof offered by plaintiff to establish his claim of incompetency consists principally of the testimony of the son, Roy, who testified that he noticed that his father "had been slipping" during the preceding several years; of Helen Plainse, widow of the son, William, who testified that since the mother's death he "had been slipping," and the testimony of Dr. Robert E. Fitzgerald.

Dr. Fitzgerald is sixty-five years of age and graduated from Marquette University in 1912. Since that time he has specialized in nervous and mental diseases. He testified that he had examined many cases, over two thousand in the various courts.

He examined Mr. Plainse in October, 1950, and in January, 1952. At the first examination he found him confused and suffering from the usual arteriosclerosis of a man of that age; that he was suffering from a cerebral arteriosclerosis

with the usual symptoms of forgetfulness and confusion. At the second examination he found an increase in these symptoms, more confusion and more lack of ability to concentrate, and that he was then suffering from a pure progressive senility; that senility as a rule is insidious in its onset and progressive over the years; that it was his opinion that the onset occurred four or five years prior to his first examination of the patient; that in his opinion during the last five years or so he was incompetent to transact his own affairs and that his condition was such that if during that period he signed a deed or other instrument he did not know what he was doing; that his opinion of the mental condition of Mr. Plainse is based not upon conjecture but upon his examination and his experience in similar cases over the years; that he does not believe that a person in the condition of Mr. Plainse during the past five years was such that he knew what he was doing.

In answer to a question upon cross-examination he testified that he could state positively that on August 23, 1950, the patient was incompetent.

A vigorous attack is made by defendants upon the testimony of Dr. Fitzgerald. They assert that it was not established that he was a "medical man," a neurologist, or a psychiatrist. There was no objection to his competency. Further, we are satisfied that he established himself as properly qualified to testify as to Mr. Plainse's mental condition. *Lowe v. State,* 118 Wis. 641, 96 N. W. 417. They suggest that the court should have ignored his testimony for the reason that "the testimony of experts is proverbially unreliable at best." While we might agree that the testimony of an expert sometimes appears to be unreliable or inconclusive, we have not previously heard it suggested that a court must or may arbitrarily reject the testimony of a medical expert upon the question of mental competency. Such evi-

dence may not be disregarded unless it is impeached. *Estate of Butt,* 181 Wis. 141, 193 N. W. 988.

Defendants contend that Dr. Fitzgerald's opinion is based upon conjecture, a conclusion not drawn from observed or proven facts. The weight to be accorded to the doctor's testimony was for the trier of the facts. *Monaghan v. Northwestern Fuel Co.* 140 Wis. 457, 122 N. W. 1066.

We are unable to agree with defendants that the trial judge's finding, that at the time of the execution of the two deeds William G. Plainse had not sufficient mental ability to comprehend the nature of his acts and to know what he was doing, is not supported by clear and satisfactory evidence.

The trial judge was no doubt influenced in finding that the defendants have displayed a purpose to acquire the father's property by a number of incidents and circumstances which appeared upon the trial. We have already referred to the fact that they claimed that they had paid the father $3,000 for the home and that, although the father customarily deposited his cash receipts to the credit of his bank account, it appears conclusively that no deposits were made which appear to have been received from the defendants for the sale of the home and the further fact that the defendant, Edward, represented that he had paid this sum to his father-in-law, first in the home, and then in the garage in the presence of his daughter who was not called to corroborate his story.

It appears from her own testimony that in 1939 after her first husband's death, Florence Engle applied for a mother's pension and now she claims that upon the death of her first husband in 1930 she received $2,000, the proceeds of a life insurance policy; that she retained that sum and applied it to the purchase price of the home. It follows that if she did so retain that amount she misrepresented her financial status when she applied for a mother's pension.

The trial judge considered it significant that when Florence Engle applied for an order appointing a guardian for

the father she stated under oath in her petition that his personal estate did not exceed a value of $200 "although upon this trial, as a witness, she testified that she then considered all of the money on deposit . . . in the Park Savings Bank, amounting to roughly $7,000, to be the property of William G. Plainse, the incompetent." She testified that when she made application for the appointment of a guardian she did not notify her brother, Roy, and that she omitted such notice because she did not know his place of residence, although at that time his name and address were carried in the Milwaukee telephone directory. For the rather minor services which she rendered to her father and which the defendants claim afford a part of the consideration for the two conveyances it probably appeared to the trial judge that there was in the one case no consideration, and in the other inadequacy, particularly when it appears that there is doubt that anything was paid in cash for the first conveyance and that the cash paid for the second conveyance was acquired by the defendants after they received the deed to the flat and used the property as security for a loan which provided them with all they paid for the deed to the flat. Shortly after the mother's death the father made a will by which he directed that his estate should be divided among his children. The will was in the custody of Florence until she was required to produce it at the trial.

Florence Engle testified respecting the bank accounts that neither she nor her husband ever deposited any of their money to the credit of the accounts; that all the deposits represent money received by the father; that the money belongs to the father, "those were his earnings and whatever he saved;" that she always knew that the money belonged to her father and that "he just had my name put on there in case he got ill or anything;" that the understanding was that if he got ill at any time and needed a lot of medical attention she would be able to withdraw the money and see that he got

it; that except for the last two, all the deposits were made by him; that he retained the passbooks until January, 1951, when she observed that he was failing mentally; that when her husband's name was included as a depositor in April, 1951, it was done for convenience, she "was not always able to go out;" that all withdrawals except two were made by the father.

On June 27, 1951, nearly two months after her father had been judicially declared to be incompetent, she opened a new account in her name alone in the Park Savings Bank by the deposit of $1,119.52 of her father's money.

Defendants rely principally upon *Estate of Staver*, 218 Wis. 114, 260 N. W. 655, as authority for their contention that the mere issuance of the passbooks in the names of the father and Florence vested ownership of the fund in them jointly. If there were nothing in the record except proof of the issuance of the passbooks the rule of that case would apply. From the testimony of Florence it appears, however, that there is more—the purpose of the father and that which was intended by him was disclosed by her. The deposits were made with no intention of passing title from the father; they were made for convenience. In the *Staver Case, supra,* the court recognizes that under such circumstances the person whose name appears with that of the actual depositor upon the evidence of the deposit acquires legal title to the fund impressed, however, with a trust in favor of the actual depositor. The court says (p. 121):

"Suppose, however, that in spite of this fact it is shown that the purpose of the deposit was to constitute the payee other than the depositor a mere agent as, for example, where the depositor is ill and wishes to make it possible for another to withdraw funds and apply them to the depositor's use, in such a situation the fact of this arrangement would justify a court of equity in affecting the legal title of such person with a trust in favor of the depositor or his heirs."

Facts similar to those before us appeared in *Marshall & Ilsley Bank v. Voigt,* 214 Wis. 27, 252 N. W. 355. There a deceased husband had opened joint bank accounts in the names of himself and his wife. When the accounts were opened he was given cards which contained an agreement similar to that contained in the agreement made in this case, that the money then and thereafter to be deposited is owned jointly by the persons named and is subject to the order of either, the balance at death of either to belong to the survivor. The court held that under the circumstances the retention by him of the passbooks evidenced his intention not to confer title upon his wife; that he had directed that her name be included as a depositor solely for his own convenience to enable her to make withdrawals on his behalf.

In the *Staver Case* the court indicated that it was probably in error in the *Voigt Case* in disposing of it on the ground that there was no delivery of the passbooks and therefore no completed gift. With respect to the *Voigt Case, supra,* the court said (p. 124):

"This ruling must likewise be modified, although the result in the *Voigt Case* was entirely correct under any view of the law. This case is similar to the illustrations heretofore given where a depositor, for the sole purpose of his own convenience, makes a joint deposit so that the other person may, for the convenience and sole benefit of the depositor, draw funds and apply them to the use of the depositor. Such a situation, if established, is sufficient to warrant affecting the legal title with a trust in favor of the husband's estate."

In *Estate of Krause,* 241 Wis. 41, 4 N. W. (2d) 122, the deceased husband had opened a savings account and took out a passbook in the name of his wife. He retained possession of the book. It appeared that he had made the deposit in order that he might have the benefit of federal deposit insurance. The court rejected the widow's claim that she had become owner of the fund. The court said (p. 44):

"Not having established it the trial court correctly held that the mere fact that the account was opened in her name, the possession of the passbook having been retained by her husband, there being no evidence of delivery of the book to her by him or any other evidence tending to establish his intention to make a gift to her of the amount of money deposited, the appellant had failed to establish her case."

The last expression of this court in a situation similar to that presented here is contained in *Ruffalo v. Savage,* 252 Wis. 175, 31 N. W. (2d) 175. In that case a father and mother opened a savings account in a bank in the name of their son. No deposits were made therein except from the money of the parents; the parents retained possession and control of the passbook at all times except when it was given to the son on a few occasions for the purpose of making specific withdrawals. The son died and the action was brought against the administrator of his estate to determine the ownership of the proceeds of the savings account. The court discusses the *Voigt,* the *Krause,* and the *Staver Cases, supra,* and applying the rule that the intention of the actual depositor is controlling in the determination of the interest of the other named depositor, concludes that where it appears that the intention of the actual depositor was not to part with his title to the fund no gift results, and held that the son acquired no title to the deposits.

It appears, therefore, that in the instant case the situation is similar to that presented in the *Voigt Case,* namely, that the accounts of William G. Plainse were carried in the joint names of himself and his daughter,—later also of the son-in-law, and still later in the name of Florence alone,—solely for the convenience of the father in handling the fund and that therefore the court properly held that the moneys on deposit in the Park Savings Bank, $7,120, are the property of the father and that they should be paid over to his guardian.

The contention is made by defendants that the court erred in refusing to permit Attorney Aaron L. Tilton to answer the question, "Did he [the father] appear to understand the nature of the proceedings?" The question was propounded after Mr. Tilton had testified that he had prepared the two deeds and as to what took place in his office when they were being executed. Conceding that he should have been permitted to answer the question, the error cannot be held to be prejudicial unless we might be able to determine from the record that the refusal was prejudicial to the rights of the defendants and that his answer could be expected to affect the result of the case. *Pomeroy v. Heddles,* 95 Wis. 453, 70 N. W. 557; *Widness v. Central States Fire Ins. Co.* 259 Wis. 159, 47 N. W. (2d) 879; sec. 274.37, Stats. Since no offer of proof was made we are unable to make such determination. *Langer v. Chicago, M., St. P. & P. R. Co.* 220 Wis. 571, 265 N. W. 851; *Will of Dobson,* 258 Wis. 587, 46 N. W. (2d) 758.

It is urged that the court erred in striking the testimony of Attorney Tilton that when the second deed was executed the father told him that he was selling the property to the defendants. We consider that if it was error to strike the testimony it was not prejudicial.

The court erred in permitting a representative of the department of public welfare to testify concerning the application of Florence for mother's aid, sec. 49.53, Stats. There was, however, other competent evidence to sustain the findings and we must hold that the court disregarded it. *Estate of Getchell,* 211 Wis. 644, 247 N. W. 859.

The father was called as a witness by the plaintiff. Objection was made. The competency of a witness to testify is a question for the trial court. *Markowitz v. Milwaukee E. R. & L. Co.* 230 Wis. 312, 284 N. W. 31. Conceding that he should not have been permitted to testify, we cannot conclude, however, that his testimony affected the result of the case.

Defendants contend that the court erred in refusing to require the return of the purchase price paid by them for the two parcels of real estate, $3,000 for the home and $5,700 for the flat. As to the $3,000 item, the court found that it had not been made. We may not disturb that finding. As to the other item it is undisputed that the money was acquired by defendants by means of a loan secured by a mortgage placed on the flat after they obtained the deed purporting to convey it to them. The mortgage, except as it has been reduced by payments, still rests upon the flat and is now, by virtue of the judgment, a liability of the plaintiff. He has gained nothing by the payment to him of the $5,700.

The judgment decrees that the defendants shall have two claims against the plaintiff. The first is as follows:

| | | |
|---|---:|---:|
| Expenditures made by defendants on home | $10,702.37 | |
| Payments made by them to apply on a mortgage on the home | 3,258.36 | |
| | | 13,960.73 |
| Less rentals for use of home | 800.00 | |
| Less amount of mortgage on home | 7,000.00 | |
| | | 7,800.00 |
| Balance of claim | | 6,160.73 |

The second is as follows:

| | | |
|---|---:|---:|
| Expenditures made by defendants on flat | 11,502.67 | |
| Payments made by them to apply on a mortgage on the flat | 375.72 | |
| | | 11,878.39 |
| Less rentals for use of flat | 1,733.00 | |
| Less amount of mortgage on flat | 6,000.00 | |
| | | 7,733.00 |
| Balance of claim | | 4,145.39 |

The only attack made upon the award of claims is that the court erred in charging against the defendants the items of rentals. The only proof with respect to rentals is that the parents of the defendant, Edward, live in the lower unit of the flat and pay no rent. His son occupies the upper unit and pays $42 per month. At the time of the trial the defendants occupied the home. At the close of the testimony and after the court announced its decision, apparently from the bench, counsel suggested that an accounting be had. The suggestion was rejected.

There is no basis for the court's determination that in computing each of the claims the amounts stated should be charged against them for the use of the properties. We agree with the trial court that the defendants are chargeable with the reasonable rental value of the home from May 1, 1951, and of the flat from August 23, 1951, to the date of final judgment, or until possession of the premises is restored to the plaintiff if that be earlier, but consider that there must be further proceedings to determine what such value and amount is. As an offset to the charge for rental value the defendants should be permitted to show what, if anything, they have paid in taxes assessed against the properties. The cause must be remanded solely for the determination of those two issues.

By the terms of the judgment the claims are awarded the defendants "without interest until the further order of the court." The judgment should be modified to provide that defendants be allowed interest upon their claims when determined from the date of the judgment.

The cause must be remanded for a determination:

(1) Of the reasonable rental value of the properties and the amount chargeable to the defendants on that account;

(2) Of real-estate taxes paid by the defendants and the amount of credit they should have on that account.

*By the Court.*—Except as herein modified, judgment affirmed. Cause remanded for further proceedings in accordance with this opinion. No costs to be taxed. Appellant to pay the clerk's fees.

A motion for rehearing was granted on February 3, 1953, and oral argument was heard March 6, 1953.

For the appellant there was a brief by *Backus & Backus,* attorneys, and *August C. Backus, Jr.,* of counsel, all of Milwaukee, and oral argument by *August C. Backus, Jr.*

For the respondent there was a brief by *Rubin & Ruppa* and *Gerald H. Kops,* attorneys, and *William B. Rubin* of counsel, all of Milwaukee, and oral argument by *William B. Rubin.*

The following opinion was filed March 31, 1953:

GEHL, J. (*on rehearing*). Defendants in their argument upon motion for rehearing call our attention for the first time to two items which should have been brought to our attention and considered originally. They attack the trial court's findings to the effect that at the time of trial there was on deposit in the Park Savings Bank credited to the account of Florence Engle and Edward C. Engle, Sr., the sum of $7,120, also in the same bank credited to the account of Florence Engle the sum of $1,119.52. The court determined that these were the moneys of the plaintiff. The record discloses that the court was in error in that there was on deposit in that bank only the sum of $7,120. The latter figure is substituted for the figure $8,239.52, where it appears in our original opinion.

The second item called to our attention appears in our statement of the "second" claim allowed the defendants. There appears the recital "Less amount of mortgage on home [the word 'flat' should be substituted for the word 'home'], $6,000." Apparently the trial court assumed that the pro-

ceeds of the mortgage placed upon the flat by the defendants were retained by them. It appears from the record that the defendants did not retain the proceeds of the mortgage, but that they reached the plaintiff, the greater part thereof having been deposited to his credit in the bank account which we have determined is the property of the plaintiff.

Although the judgment must be modified as we have indicated, in view of the failure of the defendants to assert in the trial court and in their original argument made here their present contentions requiring such modification they cannot be allowed the costs usually allowed to the prevailing party upon an appeal.

In order to avoid the possibility of confusion we consider it necessary to restate the mandate with the required modification.

*By the Court.*—The judgment is modified to provide that defendants be allowed interest upon their claims, when determined, from the date of the judgment. Subdivision (b) of that part of the judgment which decrees that defendants shall have a claim against plaintiff is modified by striking therefrom the provision "less $6,000, being the mortgage placed thereon," and by inserting, in lieu of the provision, "a total of $4,145.39," the provision "a total of $10,145.39."

The cause is remanded for a determination:

(1) Of the reasonable rental value of the properties and the amount chargeable to the defendants on that account;

(2) Of real-estate taxes paid by the defendants and the amount of credit they should have on that account.

Except as herein modified, judgment affirmed. Cause remanded for further proceedings in accordance with this opinion. No costs will be allowed to either party upon the appeal or upon this motion. The appellant will pay the clerk's fees on the appeal and on the motion.