45 So.2d 408 (1950)
BYRNES
v.
NATIONAL CASUALTY Co. et al.
No. 19412.
Court of Appeal of Louisiana, Orleans.
March 27, 1950.
*409 Joseph A. Casey, M. C. Scharff, New Orleans, for plaintiff-appellant.
Gordon Boswell, Stanley E. Loeb, New Orleans, for National Casualty Co., defendant-appellee.
Plauche F. Villere, New Orleans, for Denis Rufin, defendant-appellee.
JANVIER, Judge.
Plaintiff, an elderly lady, sustained serious physical injuries on the night of November 28, 1948, when she fell while walking in the parking lot provided by the operator of a restaurant located at 3016 South Carrollton Avenue, known as "Ye Olde College Inn". She brought this suit for damages against Denis Rufin, Sr., the owner and operator of the restaurant and the adjoining parking lot, and against Rufin's insurer, National Casualty Company, erroneously sued as National Casualty Company of Detroit. She prayed for solidary judgment against the two defendants in the sum of $25,168.80.
She charged that the accident resulted from the negligence of Rufin in that the parking lot was poorly lighted and in that Rufin permitted a large hole, filled with water, to remain in the surface of the lot, with the result that, being unable to see the hole because of the darkness, she stepped into it and fell to the ground, sustaining a fracture of her right hip.
Defendants admitted the occurrence of the accident and that the restaurant and parking lot are operated by defendant, Rufin, but they denied all liability to plaintiff, denying in particular that the parking lot was poorly lighted, and averring that plaintiff's accident was caused by her own negligence in failing to observe and avoid the hole into which she stepped. In the alternative that it should appear that there was any negligence on the part of defendant, Rufin, then defendants alleged that the accident resulted from the contributory negligence of plaintiff herself as above set forth.
After an extended trial in the district court, there was judgment dismissing plaintiff's suit, and she has appealed.
The record shows that on the Sunday night in question the plaintiff arrived at the establishment at about seven or seven-thirty o'clock in an automobile owned and driven by Charles M. Ives. In the car also were Mrs. Ives, their two children, and Mrs. Ives' mother, Mrs. Charles A. Butler. The car was parked in the parking lot under or near a tree, and the entire party walked across the lot and entered the restaurant. Some time later they left the restaurant to return to the automobile, and just before Mrs. Byrnes reached the automobile the accident occurred.
The parking lot was surfaced with clam shells, and the record shows that the owner, Rufin, had contracted with a paving contractor to pave the surface of the lot *410 with "blacktop", but that the paving contractor, having found it impossible to devote the necessary time to it as promptly as Rufin desired, had dragged or scraped the lot on various occasions in an effort to keep it in proper condition, and that the last scraping or dragging had been performed about three days before the occurrence of the accident. This last scraping had been done on Thanksgiving Day, which was the preceding Thursday, and the accident occurred on Sunday night, or, as we have said, three days later.
Plaintiff makes two charges of negligence: (1) That Rufin was at fault in allowing the hole to remain in the surface of the lot, and (2) that the lot was improperly lighted.
It is obvious, of course, that there is no duty in the operator of such a lot to maintain its surface absolutely smooth. It must be recognized that in such a surface there are always depressions or indentations, and therefore it cannot be said that it is negligence to allow such indentations to remain so long, as they are only such as may be expected in such a place. Plaintiff, however, asserts that this particular hole was about five inches deep and was three or four feet long and two feet or so in width. Defendants did not attempt to prove the exact depth of the hole at its deepest point, though Albert Rufin, who was on duty at the time, says that it was "maybe about 2 inches deep."
Mr. Ives, testifying as a witness for plaintiff, says that it was "perhaps four or five inches in depth in the center", though he says that there was water in it and that he did not measure it, and he added: "* * * it is impossible to determine the depth of the hole covered with water."
Mrs. Ives said: "I imagine it was about 4 inches deep, because it was covered with water and I don't know the exact depth." She said that she had seen the hole when she and the children got out of the car to go into the restaurant. She said that the children "have very bad eyesight and I am always on the lookout for them."
Emile Rufin, who says that he "runs" the place, said that the hole "looked like an area three or four feet long and two or three feet wide, with a small amount of water in it. He said that he was not in position to say how deep it was.
Amato, one of the employees of defendant Rufin, says that he couldn't say how deep the hole was, but he described it as a water puddle about three to four feet long, about two feet wide and sloping down towards the center.
There is no doubt at all that there had been considerable rainfall either on that day or the preceding day, and there is no doubt too that in such a surface of crushed shells there are bound to be depressions or indentations in which water will remain after a substantial amount of rain has fallen.
We conclude, from all of the testimony concerning the description of the hole, that it was not sharply defined in the sense that there was a precipitous drop to its bottom, and that it was merely a depression in the surface. In fact, this is conceded by all of the witnesses, most of whom referred to it as a depression or as an indentation, or as a water puddle.
It is true that one of the employees of defendant Rufin, the witness Amato, to whom we have already referred, is said to have remarked: "The lady has fallen. That's a shame. They had contracted to have this repaired." However, we do not see in this remark any statement that he recognized the hole as being dangerous. He merely expressed the view that it was unfortunate that the lady had stepped into the water, and that he knew that the owner of the establishment had made a contract with the paving contractor to substitute for the shell surface the blacktop surface, and that this contract had not, at that time, been carried out.
In determining what is a defect in a sidewalk, or a store aisle, or a parking lot, we must take into consideration the nature of the establishment, and we must undertake to determine just what type of surface the user would have the right to expect. A person walking through a store is justified in assuming that the floor is level and smooth. But where a *411 person walks in a parking lot, surfaced with shells, it must be realized that that surface will have indentations and depressions, and the person using it must exercise such care as may be required in the use of such a surface, and we do not see that it can be said to be actionable negligence of the owner of such a surface to allow indentations such as that which is indicated by the evidence here, to remain.
In White v. City of Alexandria, 216 La. 308, 43 So.2d 618, the Supreme Court, as expressed in syllabus No. 3, said: "A pedestrian is entitled to assume that the sidewalks are not dangerous and is not required constantly to observe the surface of the walk or to exercise the care that would be necessary in traversing a jungle, but he must exercise ordinary care when using the sidewalk, having in mind that there exist irregularities in the walks brought about by natural causes such as rains, expension, soil erosion and tree roots."
In a very recent case, Massicot v. City of New Orleans, La.App., 43 So.2d 621, 622, we quoted from White v. City of Alexandria, supra, and said: "`For determining what is a dangerous defect in a sidewalk (that which renders the municipality responsible in damages to a pedestrian injured as a consequence thereof) there is no fixed rule; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question of whether or not the walk was maintained in a reasonably safe condition for persons exercising ordinary care and prudence.'"
Our conclusion is that there was no actionable negligence insofar as the surface of the lot was concerned and that plaintiff, had she used such care as should have been used by an ordinarily prudent person walking on such a surface, would not have stepped into the hole.
Plaintiff sought to show that the lot was very dimly lighted, and that defendant intentionally failed to properly illuminate it because he knew that his establishment was much frequented by young persons who desired to remain in their automobiles and who did not wish to be recognized by patrons in other cars. There is practically no evidence to support this contention, though there is much evidence touching on the lighting conditions in and surrounding the parking lot.
Though counsel for plaintiff, in oral argument, sought to convince us that the lot was shrouded in total darkness, a study of the evidence convinces us that that is not the situation, and that there was sufficient light for a person using ordinary care to see the ground and to discover the unevenness of the surface, and to see that there was water in the hole in which plaintiff walked, and that plaintiff could have discovered it had she herself exercised ordinary care.
It is true that the only illumination provided by Rufin came from fluorescent or Neon lights along the side of the building, but in addition to these lights there was a large overhead city light on the neutral ground on the nearest edge. The tree under or near which the automobile was parked is located apparently forty or fifty feet from the side of the building and not more than forty or fifty feet from the front sidewalk, so that it was not more than seventy or eighty feet from the city light, which was on the nearest side of the neutral ground.
Although some of the witnesses undertake to say that the illumination was extremely poor, there is much evidence to the effect that the light which was provided was adequate for the reading of menus by persons in their cars, and was sufficient for the attendants or employees of the restaurant to write order-slips while standing in the yard.
Plaintiff herself was unwilling to say that the lot was shrouded in Stygian darkness. Counsel for defendants, on cross-examination, suggested to her: "When you got out the automobile there was no artificial illumination there, no lights at all? It was pitch dark?" But she answered: "It wasn't pitch dark. There was a light that did show in the park from the restaurant." A little later counsel suggested to her that she knew that "the yard was poorly lighted", and that she "couldn't see *412 the ground." She answered that it was poorly lighted, but she added: "I saw the others go ahead and not fall and I walked behind them * * *."
Mr. Ives said that it was "very dark". Mrs. Ives was asked about the lights and she said: "Well, it was nighttime and you couldn't see very much, I didn't pay any attention coming back." Again counsel attempted to have her say that the lot was poorly lighted, but her answer was: "It wasn't bright, no."
It must be remembered too that Mrs. Ives noticed the hole on going into the restaurant at about seven or seven-thirty o'clock. Counsel contends that at that time night had not fallen, but we do not need evidence to prove that on November 28, at seven or seven-thirty, night has completely fallen.
Mrs. Butler, another witness for plaintiff, when asked about the light, said, "Well, they are not very good. The lights are not good at all."
However, as we have already said, there is other evidence to the effect that patrons could read menus, and that attendants could write orders by such lights as were provided.
Amato, the witness already referred to, when asked about the light, said, "They were good." He also said that "directly across is a street light, a large light; then we have on the side of the building a Neon light." He was asked how he knew that he could read a menu there, and he said: "I have tried it." He added that he had stood "right on the spot where the accident occurred," and that standing there by the same light he could read a menu easily.
Albert Rufin said that when he was told about the accident he went into the lot to investigate and that the Neon tubing on that side was lit. He was asked whether that tubing showed "very much light" and he answered, "Yes, sir; very much." He added that the light from the neutral ground did not shine entirely to the rear of the lot, but that it gave light "enough so you can walk and see anywhere you want to go."
Emile Rufin said: "There was a big light outside of the building from the street a city light, and they have illumination from the building from a neon tubing."
Had the District Judge found for plaintiff, that is to say, had he reached the conclusion that there was not sufficient light or that the so-called hole was of a dangerous nature, we would not have found justification for a reversal, but since, on the contrary, he obviously found that there was sufficient light and that the hole was not of a dangerous nature, we conclude that the record does not convince us that he was manifestly in error.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.