PAEPCKE and wife, Respondents, vs. SEARS, ROEBUCK
& COMPANY, Appellant.

*February 3—March 3, 1953.*

For the appellant there was a brief by *Dougherty, Arnold & Waters* of Milwaukee, and oral argument by *Suel O. Arnold.*

For the respondents there was a brief by *Charles M. Hanratty* and *Kersten & McKinnon,* attorneys, and *Arlo McKinnon* of counsel, all of Milwaukee, and oral argument by *Mr. Hanratty* and *Mr. McKinnon.*

GEHL, J.   Defendant contends, first, that it was not established that it had violated the safe-place statute with respect to lights. There is a sharp conflict in the testimony bearing upon that issue.

Sylvia Paepcke, her sister, her brother-in-law, and her mother each testified that when they entered the lot at about 9:00 p. m. it was in darkness. Police Officer Steuck who arrived at the scene between ten and twelve minutes after

9 p. m. testified that the lot was then in darkness. Police Officer Rutzen who arrived at about 9:08 or 9:09 observed that no lights were burning and that the lot was then in darkness. To meet this testimony there was offered that of two of defendant's employees and the operator of a Christmas-tree concession on the Sears lot, each of whom testified that the lights were burning at the time.

Defendant contends that the jury's finding with respect to lights is contrary to the physical facts and bases this argument principally upon the testimony of its witnesses that the only switch used for the operation of the lights was in a so-called "chicken house," one of the smaller buildings near the auxiliary lot; that the operator of the Christmas-tree concession testified that the lights at his station were still burning and that they were operated from the same switch in the chicken shack, and that it follows necessarily from the fact that the lights in the Christmas-tree concession were still burning that those illuminating the lot must also have been burning. This, the defendant contends, is a physical fact which discredits all of the testimony offered by plaintiffs as to the matter of lights. It might be so considered if it were undisputed that the lights in the concession stand were still burning. That is not the fact, however. The existence or nonexistence of lights in the concession stand was established not by any physical fact appearing without contradiction, but by the testimony of witnesses who testified as to both the affirmative and the negative on that issue.

The sister testified that there was no light in the vicinity of the Christmas-tree concession and that the only light she observed was that which fell from the street light on the opposite side of South Fourteenth street. The defendant attacks the testimony that the lights were out as being only negative in character. While the testimony of the police officers as to what they found when they appeared upon the scene might possibly be considered as remote, it cannot be said that the

testimony of Sylvia Paepcke and her associates, who testified positively that there was no light, is negative. The testimony of a witness that an area is in darkness is not negative because it suggests the absence of light.

The question as to whether the parking lot was adequately lighted was for the jury. They found that it was not and we may not say that there was insufficient credible evidence to sustain the finding.

Defendant complains that there was no credible evidence to establish that at the time in question the defendant had knowledge that the lights were out or that it had turned them out. It contends that if the lights had been turned out they were turned out by the employee of the Christmas-tree concessionaire and that plaintiffs failed to establish agency on his part. The manager of the farm store, who had supervisory authority on behalf of Sears with regard to the operation of the lights, testified that the employee of the concessionaire had the "privilege" of using the lights until closing time and he customarily turned off the lights when he closed. It is quite clear from the record that the lights were turned off either by the manager of the farm store or by one of his assistants or by the concessionaire's employee. It is not contended that darkness could have resulted other than by means of turning the switch controlling the lights.

We held in *Pettric v. Gridley Dairy Co.* (1930), 202 Wis. 289, 232 N. W. 595, that to entitle a frequenter to recovery for failure of lights it must be established that the lights were turned off by someone for whose act the employer is responsible. The plaintiffs have met this burden by the testimony of the concessionaire's employee to the effect that he had turned off the lights and of the farm-store manager that it was at least the concessionaire's employee's "privilege" to turn them off. It is true that the employee testified that he did not turn them off until after the accident but the testi-

mony of the plaintiffs' witnesses that the auxiliary lot was dark when they entered the lot makes an issue of fact as to the time at which they were turned off.

Defendant contends that it has not been established that it violated the safe-place statute with respect to the surface of the parking lot. As we have already pointed out, Sylvia Paepcke testified that at the point where she fell there was a rut about three or four inches deep and four or five feet long and that it was bumpy in that vicinity as a result of tire marks. Her sister testified that she noticed a long rut running east and west four to four and a half feet long and three or three and a half or four inches deep and that this rut was practically under her sister's leg after she had fallen. Police Officer Steuck testified that the surface of the lot was icy and that there was snow and ice at the point where plaintiff fell but that he did not have time to observe whether there were ruts. The testimony of Police Officer Rutzen was to the same effect. Police Officer Kolpin arrived on the scene while the plaintiff, Sylvia Paepcke, was still on the ground and found that at the scene of the accident there were mounds of snow and ice and that he had never before the accident seen any cinders or abrasive material on the parking lot.

Joe Hauk testified that the surface of the lot was icy and rutty. He and his wife testified that they had been at the same lot during the evening of December 20th; that the surface of the lot was icy and rutty and in about the same condition as it was on the night of the accident. The defendant does not seriously contend that there were no snow, ice, or ruts on the lots but calls attention to the fact that its witnesses testified that the ruts were not as deep as plaintiffs' witnesses described them to be. The evidence as to the nature and condition of the surface of the auxiliary lot was also such as to present an issue for determination by the jury.

If it were not for the combination of circumstances here found to have existed we might find it more difficult to agree

that the judgment should be affirmed. If there were nothing except the rutty condition of the lot a situation might be presented such as existed in *Bersch v. Holton Street State Bank* (1945), 247 Wis. 261, 19 N. W. (2d) 175, where the plaintiff fell as the result of the slippery condition of a bank floor upon which she had entered and was held not entitled to recover. There are also cases holding that the mere inadequacy of illumination is under the circumstances insufficient to establish the violation of a safe-place statute. We have here, however, the findings of a jury supported by credible evidence of a failure to maintain a safe surface as well as of a failure to have the surface adequately lighted.

*Byrnes v. National Casualty Co.* (La. 1950), 45 So. (2d) 408, was an action brought by a woman who fell while walking in a parking lot provided by the operator of a restaurant. She charged that the accident resulted from the negligence of the operator in that he permitted a hole about five inches deep, three or four feet long, and about two feet wide to exist in the lot. The court observed that there was no duty on the part of the operator of a parking lot to maintain its surface absolutely smooth, that it must be recognized that in such a surface there are holes, depressions, and indentations, and that it should not be said that it is negligent to allow such indentations to remain. The court also speaks of the fact that a person using the lot must realize that the surface will have such depressions and indentations. Recovery was denied but the court was careful to point out that it appeared that there was sufficient light for a person using ordinary care to see the ground and discover the unevenness of the surface. It is clear from the court's opinion that had there been sufficient evidence to support a finding of inadequate illumination the result would have been different, for it said in the closing paragraph of its opinion (45 So. (2d) 412) :

"Had the district judge found 'for plaintiff, that is to say, had he reached the conclusion that there was not sufficient

light or that the so-called hole was of a dangerous nature, we would not have found justification for a reversal, but since, on the contrary, he obviously found that there was sufficient light and that the hole was not of a dangerous nature, we conclude that the record does not convince us that he was manifestly in error."

*Acme Markets v. Remschel* (1943), 181 Va. 171, 24 S. E. (2d) 430, was an action brought by one Remschel for personal injury sustained by him when he stumbled over the stump of a post left on a parking lot operated by defendant. The post was between four and eight inches high. There was a dispute in the testimony regarding the lighting of the area where the stump was located. The store manager said that it was sufficiently lighted while plaintiff and the other witness said it was not. The court stated that that issue was for the jury and that it had been resolved by the jury against defendant; that the finding that the area was not sufficiently lighted was an important fact to be considered in determining whether liability to the plaintiff existed, thus indicating that recovery was permitted because of the combination of the circumstances—the existence of the post and inadequate lighting.

It does not appear from the opinion in either of the two cases discussed that the court was dealing with a safe-place statute. Apparently the charge in each case was a violation of a common-law duty. Here we deal with sec. 101.06, Stats., which imposes upon an employer a greater burden, an absolute duty to make the place as free from danger as the nature of the employment will reasonably permit, and not merely a reasonably safe place as at common law. *Rosholt v. Worden-Allen Co.* (1913), 155 Wis. 168, 144 N. W. 650; Washburn v. Skogg (1931), 204 Wis. 29, 233 N. W. 764, 235 N. W. 437; *Haefner v. Batz Seed Farms, Inc.* (1949), 255 Wis. 438, 39 N. W. (2d) 386.

Because we have determined that there was sufficient evidence to sustain the jury's finding that the safe-place statute

was violated it is not necessary for us to consider whether or not the defendant was guilty of common-law negligence although the jury found a violation of duty in that respect also.

Defendant contends that the court erred in not having found Sylvia Paepcke guilty of contributory negligence as a matter of law. The test to be applied in determining whether she was guilty of contributory negligence, even assuming that she had knowledge of the existence of ruts in the surface of the parking lot, is whether a reasonably prudent person would, under the circumstances, use such place for walking, and that question is for the jury. A court may not hold that a pedestrian is guilty of contributory negligence as a matter of law in such a situation unless the danger of using the area is so obvious and glaring that a reasonably prudent person would not do so. In the absence of light it cannot be said that the danger created by the existence of ruts was so obvious and glaring that a reasonably prudent person would not have walked at the place where Sylvia Paepcke fell.

Sylvia Paepcke was rightfully upon the parking lot and chose as a way of approaching the automobile what appeared to her in the dim light to be a safe course. In such circumstances it may not be held that she was guilty of negligence as a matter of law.

Defendant contends that the jury's finding that the lights were out resulted from error committed in the cross-examination of defendant's witnesses. Sometime before trial, plaintiffs' counsel wrote to counsel then representing the defendant asking him to identify the employee who had turned out the lights on the night of the accident. Counsel replied by letter that defendant's management had informed him that the person in charge of the lights and who turned them off on the night of December 22d was Mitchell C. Serafin, its farm-store manager. At the trial Serafin denied that he personally had turned out the lights and stated that the concessionaire's

employee had done so. Upon cross-examination he was asked whether he had informed defendant's attorney that he had turned them out. An objection was sustained. The question was repeated and an objection thereto again sustained. It was asked again in somewhat different form. The court suggested a discussion in chambers. Plaintiffs' counsel showed the letter to the judge who stated that he would not permit its use and that if Serafin should answer the question put to him " 'No,' that wouldn't be fair. You would have to call Mr. Schuler," the author of the letter. After further discussion in chambers the judge ruled that the letter would not be received.

Following the examination of Serafin and against objection Mr. Schuler was called by plaintiffs. He identified the letter as having been written by him. Plaintiffs' counsel, against repeated objection, made a strenuous effort to examine Mr. Schuler with respect to the contents and meaning of the letter. There were consistent rulings against him. He offered the letter in evidence and it was rejected.

Defendant contends that it was prejudiced by the conduct of plaintiffs' attorney; that it was improper to permit counsel to persist in asking objectionable questions after the court's repeated rulings against him, and to allow him, after rulings against him also, to ask "question after question" to get the contents of the letter into the record, and by means of persistent misconduct to lead the jury to believe that the witness had made contradictory statements to his attorney and was therefore lying at the trial, and that counsel's effort was made to create the impression with the jury that by reason of technical objections plaintiffs were being denied the opportunity to introduce evidence. The court refused to receive the letter in evidence.

Defendant also complains of the conduct of counsel in his examination of William Egan, employed at the time in defendant's farm store. Egan had testified that he did not

know who had turned off the lights on the night in question. He was asked questions in various forms, questions the answers to which might tend to establish that whoever turned off the lights had done it as defendant's agent. Despite several rulings against him the question was repeated in one form or another. The questions were objected to upon the ground that they were argumentative, included reference to matters which had not been testified to, and that they called for a legal conclusion.

Defendant's principal, though not sole, complaint against the conduct of plaintiffs' counsel is that he was permitted to persist in repeating questions after the court's consistent rulings against him; that he did so for the purpose of placing before the jury matters which it was not proper for them to consider.

It is true that counsel should not have persisted in his effort to get into the record matters which the court had rejected. The trial judge who was better able than are we to observe the possible effect of counsel's effort considered that defendant was not prejudiced thereby. We are unable to say that the record discloses that he was wrong in his conclusion.

"Under the established rule that, no matter how many errors may be committed in the course of a trial, they will not operate to disturb the judgment on appeal unless it appears, pretty clearly, that had they not occurred the result might probably have been more favorable to the party complaining, generally, there is little use in bringing to the attention of this court many detail matters in respect to the admission of evidence, where such matters must be considered in connection with a mass of evidence and many circumstances, in the light of the presumption that the trial was before a competent trial judge and an impartial and intelligent jury. Such a jury may be swayed by immaterial evidence or rather unfair conduct of counsel; but the fact in that regard must, pretty clearly, affirmatively appear from the record, or errors assigned as to such conduct, or mere irrelevant or immaterial evidence,

or the rejection of evidence, else the fault, in case of there being any, must be regarded as nonprejudicial." *Union Bank v. Commercial Securities Co.* (1916), 163 Wis. 470, 482, 157 N. W. 510.

One of the principal issues was the question, not who turned out the lights, but *when* they were turned out, before or after the accident. There was a sharp dispute in the testimony in that regard which presented a matter for determination by the jury. As we have pointed out, the record discloses that the lights were turned out by someone acting for defendant. We do not consider that it appears clearly that the conduct of counsel—which occurred in his effort to establish who turned the lights out, and to impeach the witness Serafin who had testified regarding that question—had it not occurred, the result might probably have been more favorable to defendant. The same is true with respect to the conduct of counsel in his examination of the witness, Egan. The conduct of counsel did not operate to influence the jury unduly in its determination of the real issue—when were the lights turned out?

During the cross-examination of Mr. Fischer, one of defendant's employees, a recess was taken. When court reconvened Fischer was asked several times against objection whether during the recess he had talked about the case with his fellow employees. The question was repeated after adverse rulings.

A reading of Fischer's testimony discloses that there was some reason for questioning his credibility. Inconsistent answers given by him would naturally arouse a suspicion that the story he had told was the result of influence exerted by some improper motive or pressure. Under the circumstances we may not say that defendant was prejudiced by counsel's conduct. We find no authority for the contention that a witness should not be questioned as to discussions had by him regarding the case prior to or during the trial.

Defendant contends that the award of damages is excessive. Dr. Edward Backus, the attending physician, testified that he commenced treating Mrs. Paepcke on December 23, 1948. He found a trimalleolar fracture of the right ankle with fragmentation and displacement backward and to the side. The malleoli form the supporting mechanism of the ankle joint and if one of them is broken the ankle joint is weakened. The X-ray pictures disclosed that the calcis or heel was dislocated; that the talus was entirely disengaged from the ankle joint and that there were multiple fractures in a small bone near the fibula; that the ankle was turned outward; that there was posterior and lateral displacement of the talus, a tilting of approximately 10 degrees of the talus; that the ankle was pushed outward and backward. He reduced the fracture and applied a plaster cast containing a walking iron and to reduce the dislocation of the foot he turned it in an inward direction. The cast covered the entire leg from the toes to the groin. Mrs. Paepcke was discharged from the hospital on December 24, 1948. She was given morphine or seconal for pain. For two months following her discharge from the hospital she was in bed and the cast was left on her leg. She complained to the doctor of pain during all of that time. In February, 1949, the doctor examined her again. He found that the fracture line in the distal fibula was still visible and that there was evidence of slight healing. He found so many fragments resulting from the multiple fracture that he could not count them and it was difficult to state with certainty whether there had been any actual union between the medial malleolar fragments. After his examination in February he prescribed a walking cast extending from the foot to the knee. Mrs. Paepcke testified that for two months following the examination made in February she was home in bed and that thereafter she walked on crutches for an additional period of two months.

The doctor testified that during all of that time she complained of pain and swelling and instability in the ankle joint. He testified that at the time of the trial she had a poor ankle joint and some immobilization or stiffness and that she still had some pain there; that he prescribed a lift of a quarter of an inch to be inserted in her right shoe so as to cause more inversion and thereby strengthen her ankle; that it will be necessary to wear the lift permanently. At the trial Mrs. Paepcke was asked to demonstrate the manner in which the wearing of the lift affected the position of her ankle and foot and the doctor testified that the foot is kept in inversion as was observable by the jury in an effort to correct her condition. He testified that she is required to wear a woven ankle support to prevent swelling and that the condition which causes the swelling will be permanent. The blood circulation in the leg is not normal and the damage to the lymphatics and ligaments of the ankle joint is permanent and relief in that respect can be obtained only by the use of the lift and the woven bandage. She is unable to use the foot for more than a short period of time without suffering excessive pain.

Dr. Backus testified that he found a definite personality change attributable to the injury. He attributed all of her complaints to the injury.

Dr. David J. Ansfield testified that the ligaments of Mrs. Paepcke's right ankle are permanently damaged as a result of the injury. Mrs. Paepcke testified that she limps constantly; that she cannot scrub or do housework involving considerable exertion and cannot walk appreciable distances, and that she cannot engage in dancing, skating, or other recreation which she enjoyed before the accident.

Dr. Ansfield testified that the symptoms which appeared earlier still persisted at the time of the trial. The condition of the ankle is permanent and it is not likely to improve but

will handicap her in the future; that she will tire quickly, will not be able to walk a long distance; that she will have difficulty in climbing steps and in walking over unpaved surfaces; and that these effects will be with her during the balance of her life.

Mrs. Paepcke was twenty-nine years old and the mother of five children at the time of the accident.

The defendant urges that Dr. Backus should not have been permitted to testify as to Mrs. Paepcke's personality changes. His qualifications as a physician of general practice are not disputed.

His experience as a physician over a period of nearly twenty years coupled with the fact that he had been the Paepckes' family physician since the time their first child was born made him competent to testify. *Lowe v. State* (1903), 118 Wis. 641, 96 N. W. 417; *Plainse v. Engel* (1952), 262 Wis. 506, 56 N. W. (2d) 89.

The defendant contends that the jury was prompted to make an excessive award because of the fact that plaintiffs' counsel was permitted to ask Mrs. Paepcke as to the amount of wages earned by her husband at the time of the accident. If there was error in that respect it was cured by the court's admonition to the jury that they were to disregard any testimony with reference to the husband's income. We may not ignore entirely the trial court's determination that the damages awarded are not excessive. The court was in a position to observe Mrs. Paepcke and the effect which her injuries had and as it appeared at the time of the trial. The evidence warranted the assessment of Mrs. Paepcke's damages at $15,000 and of her husband at $2,000.

*By the Court.*—Judgment affirmed.